[No. B165072. Second Dist., Div. Seven. June 28, 2004.]

STEVEN KESMODEL, Plaintiff and Respondent, v.
MICHAEL L. RAND et al., Defendants and Appellants.

**COUNSEL**

T. Joshua Ritz for Defendants and Appellants.

Bird, Marella, Boxer & Wolpert, Gary S. Lincenberg and Amanda R. Touchton for Plaintiff and Respondent.

OPINION

**JOHNSON, Acting P. J.**—A tenant of an apartment building sued two other tenants for false imprisonment after they falsely claimed he was a "peeping Tom" and placed him under citizen's arrest. The matter was tried to a jury which found in plaintiff's favor. The jury awarded economic, noneconomic and punitive damages. Defendant tenants appeal, claiming they are immune from liability under Civil Code section 47, subdivision (b) because their acts and communications with the police in effecting the citizen's arrest were designed to prompt action by government officials and thus were absolutely privileged. Alternatively, they claim if the jury properly found them liable for false imprisonment then the trial court erred in imposing liability against them jointly and severally for the noneconomic damages awarded by the jury. We find no error. Accordingly, we affirm.

## FACTS AND PROCEEDINGS BELOW

The parties to this lawsuit are neighbors who live in a five-unit apartment building in West Hollywood. Defendants, Marcia and Michael Rand, are mother and son. They live in a three-bedroom unit on the ground floor in the rear of the building. Michael is frequently required to travel in his business and is often away from the apartment. Ms. Rand, on the other hand, has been unable to work for several years because of various physical problems. At the time of the incident in 2001, she was battling cancer and had undergone a mastectomy and a series of chemotherapy treatments.

Plaintiff Steven Kesmodel, his wife Deena, and their young son Matthew, moved into the apartment building in 1999. They occupy a two-bedroom unit on the second floor above the carport in the front of the building.

Apparently, the Kesmodels' lifestyle interfered with Ms. Rand's peace and quiet. Shortly after the Kesmodels moved in Ms. Rand complained to police about their dog's barking. Another time Ms. Rand came out of her unit and told the Kesmodels' son to be quiet as he played on the stairway leading to the Kesmodels' apartment. Ms. Rand complained about the Kesmodels' behavior to the landlord. She claimed they left laundry in the communal laundry room for days. She claimed they left bags of trash on the stairwell and claimed they did other things to deliberately irritate her. The landlord relayed Ms. Rand's complaints to the Kesmodels.

Using the services of the West Hollywood Neighborhood Dispute Resolution Program Steven Kesmodel arranged for a mediation to air and perhaps resolve Ms. Rand's complaints against his family. Ms. Rand did not appear at

the scheduled mediation. She instead discussed with other neighbors the possibility of circulating a petition to oust the Kesmodels from the rent-controlled apartment.

There are four water spigots around the apartment building. One of the water spigots is located on the side of the apartment building near Ms. Rand's unit and garden area. Ms. Rand's bedroom window also opens onto the side of the building where the water spigot is located. Ms. Rand sometimes opens her bedroom window for increased air circulation. Ms. Rand can hear the noise the running water creates inside her apartment when this particular spigot is in use. For this and other reasons, Ms. Rand believed the landlord had promised no one other than she or the gardener had permission to use this particular water spigot.

On Friday, July 13, 2001, Kesmodel used this spigot to hose down the side walkway where his son and his son's friend had dripped Popsicle juice. Ms. Rand came to the fence, yelled, and told Kesmodel to stop. He essentially ignored her request. Ms. Rand complained to the landlord about Kesmodel's use of the water spigot near her unit. She apparently did not receive the response she desired and called the police. Ms. Rand told the officers Kesmodel had been looking at her through her open bedroom window. She begged the officers to make Kesmodel stop harassing her by using her water spigot and interrupting her rest.

Later in the day, Sheriff's deputies arrived at the Kesmodels' apartment and spoke with Deena Kesmodel. Steven Kesmodel had taken the boys swimming and was not at home. The deputies informed Deena they were there to investigate a "peeping Tom" complaint lodged against Steven Kesmodel. The officers advised Deena to inform Kesmodel he should video-tape the next time he planned to use the water spigot in order to protect himself from further allegations of wrongdoing.

Two days later on July 15, 2001, Steven Kesmodel again used the water spigot to water the plants and hose down the side walkway. However, he first set up a video camera on the top of the staircase near his unit. He aimed the camera lens at the walkway and water spigot. He then hosed down the walkway. He watered the plants and returned the hose to the carport area. Michael Rand came outside for a few moments and observed Kesmodel watering through a steel mesh fence.

Ms. Rand called 911.

A few moments later Kesmodel heard Ms. Rand outside in front of the building yelling at the landlord. Kesmodel retrieved his video camera from

the stairway and videotaped the Rands from his balcony. Ms. Rand accused the landlord of failing to act and failing to keep his promise about anyone other than she having permission to use the water spigot near her unit. The landlord tried to calm her down but Ms. Rand was hysterical. She was adamant police intervention was required. Michael Rand confirmed he too had seen Kesmodel peer into his mother's bedroom as he watered. Ms. Rand made comments to the landlord about circulating a petition to oust the Kesmodels from the building. She stated she knew Steven Kesmodel worked for Time Warner. She threatened to notify his employer he had looked at her through her bedroom window.

Steven Kesmodel asked his wife to continue filming as he joined the Rands downstairs.

Sheriff Deputy Ponce arrived and spoke to the Rands. Ms. Rand told the officer she had had ongoing problems with Kesmodel and stated she believed he was deliberately harassing her. She wanted him arrested for peering at her through her bedroom window while she was lying naked in her bed. Michael Rand told the officer he had witnessed the incident. He explained that while outside watching Kesmodel water he saw Kesmodel peer into his mother's bedroom window.

The officer explained she could not arrest Steven Kesmodel because the alleged misdemeanor had not been committed in her presence. The officer advised the Rands of their options of using the neighborhood dispute resolution program or of making a citizen's arrest. The Rands apparently agreed they wanted Kesmodel arrested. Officer Ponce wrote up the citizen's arrest form. She made sure Michael Rand understood the potential consequences of making a citizen's arrest. Among other matters, the form advises, "I may be liable for any false arrest action or civil liability that the person arrested may initiate as a result of this incident." Michael Rand signed the arrest form.

Sheriff Deputy Barrett arrived to assist Deputy Ponce. He handcuffed Steven Kesmodel and placed him in the squad car as his wife and son watched from their balcony. Deputy Barrett testified that as he handcuffed Kesmodel, Michael Rand came out with a camera, took photographs and yelled out, "Matthew's teacher is going to love to see this."

The entire incident was captured on videotape and was shown to the jury at trial. The tape does not show Kesmodel peering into Ms. Rand's bedroom window. Nor when questioned could either Ms. Rand or Michael Rand point out any segment on the tape where Kesmodel might have even looked in the direction of Ms. Rand's window.

The officers transported Steven Kesmodel to the sheriff's station, where he was booked and jailed for 12 hours and then released.

According to Deputy Ponce, unless the situation presents something "way out in left field" once a person makes a citizen's arrest an officer must take the arrestee into custody. Although officers have apparently in the interim been given more discretion in deciding whether to book or release persons arrested by citizens, at the time of the incident in this case, the officers' only option was to take Kesmodel into custody. As another officer later explained, after a citizen's arrest officers act as transporting and booking, rather than arresting, officers.

A few days later Steven Kesmodel and his attorneys went to the sheriff's station seeking information on how to resolve the case and clear his name. At the station Detective Walker viewed Kesmodel's videotape of the incident. At its conclusion, the detective provided his card and offered to be a witness in any subsequent litigation. The district attorney declined to prosecute and the case was dismissed.

Steven Kesmodel filed a complaint against Michael Rand alleging false imprisonment. He later filed an amended complaint to add Ms. Rand as a defendant and to allege a conspiracy theory of liability.

A jury found the Rands had caused Steven Kesmodel to be falsely arrested and imprisoned for a crime he did not commit. The court entered judgment against the Rands jointly and severally on the jury award of $3,500 in economic damages and $27,000 in noneconomic damages, and against Ms. Rand personally for $2,000 in punitive damages.

The Rands appeal from the judgment.

## DISCUSSION

### I. *A CITIZEN'S ARREST IS CONDUCT, NOT COMMUNICATION IN AN OFFICIAL PROCEEDING AUTHORIZED BY LAW, AND THUS CIVIL CODE SECTION 47, SUBDIVISION (b) PROVIDES NO IMMUNITY FROM LIABILITY FOR FALSE IMPRISONMENT.*

The Rands contend the act of signing the citizen's arrest form was essentially a petition to the police to take action, and thus the equivalent of initiating an official proceeding authorized by law. They argue a citizen's right to petition the government for redress of grievances should include a citizen's execution of a citizen's arrest form and for this reason, should enjoy

the same immunity from liability. Accordingly, they argue they should not have been found liable for false imprisonment/false arrest for simply communicating with the police.

Civil Code section 47 provides in pertinent part: "A privileged publication or broadcast is one made: [¶] . . . [¶]

"(b) In any (1) legislative proceeding, (2) judicial proceeding, [and] (3) in any other official proceeding authorized by law, . . ."[1]

■ With the Supreme Court's decision in *Hagberg v. California Federal Bank FSB*[2] it is now clearly established citizen reports of suspected criminal activity to law enforcement personnel enjoy an absolute privilege of immunity from civil liability under section 47(b). The *Hagberg* court held citizen reports of suspected criminal activity to police designed to instigate an investigation can only be the basis for tort liability if the plaintiff can establish the elements of the tort of malicious prosecution.[3]

In *Hagberg*, a bank customer came into her bank branch to cash a check issued by her brokerage company. Bank personnel thought the check had a suspicious appearance and contacted the brokerage firm. The brokerage firm informed bank personnel the check was invalid. Bank security personnel advised the bank supervisor to summon police. Bank security personnel called the brokerage firm directly and discovered the check was in fact valid. Bank personnel attempted to inform the police their services were no longer necessary. However, police officers had already arrived. Officers detained and questioned the bank customer for 20 minutes before releasing her.[4]

The bank customer filed a complaint against the bank and others. Her complaint alleged seven causes of action, including causes of action for false arrest and false imprisonment. The trial court granted summary judgment in favor of the defendants finding the privilege established by section 47(b) applied to the bank's report to the police concerning its suspicions the check may have been counterfeit. The Court of Appeal affirmed the judgment. The Supreme Court affirmed the judgment of the Court of Appeal.[5]

---

[1] Hereafter referred to as section 47(b).

[2] *Hagberg v. California Federal Bank FSB* (2004) 32 Cal.4th 350 [7 Cal.Rptr.3d 803, 81 P.3d 244].

[3] *Hagberg v. California Federal Bank FSB, supra*, 32 Cal.4th at pages 355, 364.

[4] *Hagberg v. California Federal Bank FSB, supra*, 32 Cal.4th at pages 355–356.

[5] *Hagberg v. California Federal Bank FSB, supra*, 32 Cal.4th at pages 358–359.

The *Hagberg* court reiterated, "the absolute privilege established by section 47(b) serves the important public policy of assuring free access to the courts and other official proceedings. It is intended to ' "assure utmost freedom of communication between citizens and *public authorities whose responsibility is to investigate and remedy wrongdoing." ' (Silberg* [*v. Anderson* (1990)] 50 Cal.3d [205,] 213 [266 Cal Rptr. 638, 786 P.2d 365], italics added.) [The Supreme Court has] explained that both the effective administration of justice and the citizen's right of access to the government for redress of grievances would be threatened by permitting tort liability for communications connected with judicial or other official proceedings. Hence, without respect to the good faith or malice of the person who made the statement, or whether the statement ostensibly was made in the interest of justice, 'courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial, legislative and other official proceedings.' (*Ibid.*)"[6]

The *Hagberg* court disapproved a contrary decision of the Court of Appeal which limited the absolute nature of the privilege with respect to citizen reports to police.[7] The court also disapproved other authorities to the extent language in those decisions could be interpreted to provide immunity only for statements to police made in good faith.[8]

Of significance to this case, the *Hagberg* court also distinguished the situation in which the citizen merely provided information and left it to the officer to act or not as the situation warranted, from the situation in which a citizen intentionally and actively assists in making a false arrest.[9]

Had the Rands only informed the officers of Kesmodel's alleged criminal activity in order to prompt Kesmodel's arrest, and had the officers, after conducting an investigation based on the Rands' report, arrested Kesmodel, the Rands' activity would be protected from liability under section 47(b).

---

[6] *Hagberg v. California Federal Bank FSB, supra,* 32 Cal.4th at pages 360–361. On the other hand, the court emphasized section 47(b) would not bar a criminal prosecution "based on a statement or communication, when the speaker's utterance encompasses the elements of a criminal offense. (See, e.g., Pen. Code, §§ 118 [perjury], 148.5 [false report of criminal offense].)" (*Id.* at p. 361.)

[7] *Fenelon v. Superior Court* (1990) 223 Cal.App.3d 1476 [273 Cal.Rptr. 367].

[8] *Turner v. Mellon* (1953) 41 Cal.2d 45 [257 P.2d 15], *Miller v. Fano* (1901) 134 Cal. 103 [66 P. 183], and *DuLac v. Perma Trans Products, Inc.* (1980) 103 Cal.App.3d 937 [163 Cal.Rptr. 335].

[9] *Hagberg v. California Federal Bank FSB, supra,* 32 Cal.4th at page 374. The court noted there was a qualitative difference "between malicious *conduct* of a citizen that aided or promoted a peace officer's unlawful arrest, which might support liability, and pure *communication*, which would be protected by the statutory privilege. (See *Kimmel v. Goland* [(1990)] 51 Cal.3d [202,] 211 [271 Cal.Rptr. 191, 793 P.2d 524] [distinguishing injury from 'noncommunicative conduct' from injury arising from 'communicative acts'].)" (*Ibid.*)

However, the evidence in this case shows something far more than pure communication with the officers, i.e., conduct beyond just a *report* of the alleged crime to the police. The evidence shows after Deputy Ponce stated she would not arrest Kesmodel based on the Rands' report of his allegedly peering into Ms. Rand's bedroom window, the Rands made a citizens' arrest of Kesmodel themselves.

Because the Rands effected the citizen arrest the officers were obligated to accept custody of Kesmodel and to transport him to jail.[10] In other words, Kesmodel was not arrested and taken into custody based on the officers' independent determination of the merits of the Rands' complaint. It was instead the Rands' act of effecting the citizen's arrest, rather than simply their communication, which caused Kesmodel's detention, imprisonment and thus harm. The Rands' noncommunicative act of arresting Kesmodel was conduct and thus not privileged under section 47(b), which protects only communications or broadcasts.

"False arrest is not a different tort but merely one way of committing the tort of false imprisonment. (*Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 752, fn. 3 [63 Cal.Rptr.2d 842, 937 P.2d 273]; *Arpin v. Santa Clara Valley Transp. Agency* (9th Cir. 2001) 261 F.3d 912, 919.) The tort of false imprisonment 'is premised upon a violation of the personal liberty of another accomplished without lawful authority . . . .' (*Asgari*, at p. 753.) A peace officer who accepts custody of a person following a citizen arrest is not required to correctly determine whether the arrest was justified (see *Kinney v. County of Contra Costa* (1970) 8 Cal.App.3d 761, 768 [87 Cal.Rptr. 638] (*Kinney*)), and cannot be held liable for the arrest if it was improper. (Pen. Code, § 847.) Therefore, while a person falsely arrested by a citizen ordinarily has no remedy against the peace officer who took him into custody as a result of the arrest, he has a tort remedy against the offending citizen. (*Kinney*, at p. 769.)"[11]

This principle is aptly illustrated by the decision in *Wang v. Hartunian*.[12] A dispute arose between Wang and Hartunian over the latter's use of a vacant lot he owned which was located between his residence and Wang's mother's

---

[10] Before 1983 an officer faced criminal liability for refusing to take an arrestee into custody after a citizen's arrest. (Pen. Code, § 142.) A peace officer is still obligated to accept custody of a person who has been placed under citizen's arrest even though the officer does not believe probable cause exists for the arrest. (73 Ops.Cal.Atty.Gen. 291 (1990); *Wang v. Hartunian* (2003) 111 Cal.App.4th 744, 750 [3 Cal.Rptr.3d 909].) According to the testimony at trial, however, peace officers apparently now have at least some discretion to cite rather than jail an arrestee, and/or to release the person if warranted after investigation.

[11] *Hamburg v. Wal-Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503–504 [10 Cal.Rptr.3d 568], footnote omitted.

[12] *Wang v. Hartunian, supra*, 111 Cal.App.4th 744, review denied December 10, 2003.

house. The dispute escalated and Hartunian eventually obtained a restraining order against Wang. On four occasions Hartunian summoned law enforcement officers to report Wang's purported violations of the restraining order. On the fifth occasion Hartunian called police and reported Wang was standing at the property line threatening him and yelling at him, in violation of the restraining order. The police asked Hartunian whether he wanted to make a citizen's arrest. Hartunian signed the citizen's arrest form and the officers detained Wang and took him to the police station. Wang posted $500 bail, was released, and no further action was taken against him.[13] Wang filed suit against Hartunian for false arrest and false imprisonment, among other causes of action. Hartunian filed a motion to dismiss under the anti-SLAPP statute.[14] The trial court granted the motion and dismissed Wang's complaint.[15] Wang appealed.

The appellate court framed the issue for determination as "whether making a citizen's arrest was an act in furtherance of Hartunian's right of petition or free speech . . . ."[16] From a review of decisions applying section 47(b) the court concluded the act of making a citizen's arrest was not a protected activity. "While we agree that a report to police is subject to the privilege of Civil Code section 47, subdivision (b), we conclude that placing one under a 'citizen's arrest' is not a 'publication or broadcast' within the meaning of section 47, and thus not privileged."[17] The court acknowledged the act of making a citizen's arrest involves an aspect of privileged communication. However, the court found "the line between communication and conduct was crossed when Hartunian arrested Wang and caused the police officers to take Wang into custody."[18]

So too in the present case, although the Rands communicated orally and in writing to the officers by reporting the allegations of Kesmodel committing a criminal offense, they crossed the line between communication and conduct when they chose to make a citizen's arrest, which in turn caused the officers to detain and incarcerate Kesmodel. While their words may have been privileged under section 47(b), their wrongful actions were not. Accordingly, their conduct in effecting the false citizen's arrest was not shielded from liability as a protected activity under section 47(b).[19]

---

[13] *Wang v. Hartunian, supra,* 111 Cal.App.4th at page 746.

[14] Code of Civil Procedure section 425.16.

[15] *Wang v. Hartunian, supra,* 111 Cal.App.4th at pages 746–747.

[16] *Wang v. Hartunian, supra,* 111 Cal.App.4th at page 748.

[17] *Wang v. Hartunian, supra,* 111 Cal.App.4th at page 749.

[18] *Wang v. Hartunian, supra,* 111 Cal.App.4th at pages 751–752.

[19] *Kinney v. County of Contra Costa* (1970) 8 Cal.App.3d 761, 769 [87 Cal.Rptr. 638] ("It is noted that a person falsely arrested by a citizen has his remedy, as successfully pursued here, against the offending citizen.").

The Rands contend Michael signed the citizen's arrest form at Sheriff Deputy Ponce's direction after she suggested a citizen's arrest as a possible course of action. They claim private citizens such as themselves are not liable for false imprisonment when they simply act at the direction of the police. In support of their argument, the Rands rely on the decisions in *Gomez v. Garcia*[20] and *Peterson v. Robison*.[21]

In *Gomez*, a former employee refused to leave the business premises after being requested to do so. He disrupted a staff meeting and used loud and abusive language in asserting his right to refuse to leave. Garcia, his former supervisor, called the police. When police officers arrived they informed Garcia the only way they could remove Gomez from the premises was for Garcia to make a citizen's arrest. Garcia had no experience in such matters so police officers told Garcia what to do and say. Officers told Garcia to state he was making a citizen's arrest of Gomez for disturbing the peace. In the factual circumstances it apparently would have been more accurate to charge Gomez with trespass.[22] Officers took Gomez into custody, where he remained incarcerated for 16 hours.[23] In a later misdemeanor prosecution Gomez was acquitted of the charge of having disturbed the peace. Gomez sued Garcia and others for false imprisonment and malicious prosecution. A jury found in Gomez's favor and Garcia appealed.

The appellate court reversed. The court noted the fact Garcia cited the wrong crime at the police officer's direction when making the citizen's arrest was insufficient standing alone to make him liable for false imprisonment. The court stated if the complained-of conduct "in fact constituted a public offense, the person making the arrest is not liable simply because he is mistaken as to which particular statute was violated."[24] More significantly, however, the court found Garcia could not be liable for false imprisonment because *"[t]here [was] no evidence in the record to suggest that Garcia gave false information to either the police or the prosecuting agency or that he misled them in any way."*[25] For these reasons the appellate court found Garcia could not be liable for false imprisonment.

The decision in *Gomez* does not assist the Rands. First, there is no evidence Sheriff Deputy Ponce directed the Rands to make the citizen's arrest, or directed Michael Rand to sign the citizen's arrest form. Instead, the evidence showed the officer informed the Rands they had as one option the

---

[20] *Gomez v. Garcia* (1980) 112 Cal.App.3d 392 [169 Cal.Rptr. 350].

[21] *Peterson v. Robison* (1954) 43 Cal.2d 690 [277 P.2d 19].

[22] *Gomez v. Garcia, supra,* 112 Cal.App.3d at pages 396–397.

[23] *Gomez v. Garcia, supra,* 112 Cal.App.3d at page 396.

[24] *Gomez v. Garcia, supra,* 112 Cal.App.3d at page 397.

[25] *Gomez v. Garcia, supra,* 112 Cal.App.3d at page 397.

choice of making a citizen's arrest. Moreover, and in contrast to the situation in *Gomez*, the evidence in the present case conclusively established the information the Rands provided the police *was* false and misleading. Accordingly, the decision in *Gomez* is factually distinguishable.

The decision in *Peterson v. Robison* is similarly inapposite. In *Peterson* the defendant reported the plaintiff had crashed into his parked car with such force it knocked his car onto the curb and into a city's parking meter. Police sent out a radio bulletin regarding the incident and the plaintiff was later arrested by other officers.[26] At the police station officers pressed the defendant into making a citizen's arrest so the officers could charge the plaintiff with the additional, and more serious, offense of having committed a hit and run accident while intoxicated.[27] The defendant was ultimately found liable for false imprisonment but the Supreme Court reversed the judgment. The Supreme Court found, "[a] private citizen who assists in the making of an arrest pursuant to the request or persuasion of a police officer is not liable for false imprisonment. [Citation.] It would be manifestly unfair to impose civil liability upon the private person for doing that which the law declares it a misdemeanor for him to refuse to do. (See Pen. Code, § 150 [misdemeanor for man over 18 to refuse officer's lawful request for aid in arrest]; see also *id.*, § 839.)"[28]

In the present case, by contrast, there was no evidence Deputy Ponce either requested, directed or persuaded the Rands to make the citizen's arrest. At most, the evidence was Deputy Ponce explained making a citizen's arrest was an option the Rands could elect to pursue. The act of explaining options for resolving a neighborhood dispute is in no way analogous to pressuring a citizen into doing something he was not otherwise inclined to do, as was the case in *Peterson*. Accordingly, we conclude these decisions provide no basis for overturning the judgment in this case.

## II. *MS. RAND WAS PROPERLY FOUND LIABLE FOR FALSE ARREST/IMPRISONMENT AS A COCONSPIRATOR.*

Ms. Rand did not sign the citizen's arrest form. She thus asserts she cannot be liable for merely summoning the officers and orally reporting to them her suspicions of Kesmodel's criminal activity. She contends her acts were pure communication which fall squarely within the absolute privilege of section 47(b) for communications to law enforcement officers. Accordingly, she argues she is immune from liability.

---

[26] *Peterson v. Robinson, supra,* 43 Cal.2d at pages 691–692.

[27] *Peterson v. Robinson, supra,* 43 Cal.2d at page 696.

[28] *Peterson v. Robinson, supra,* 43 Cal.2d at page 697.

Ms. Rand's argument ignores the fact the jury found her liable as a coconspirator in Kesmodel's unlawful arrest and imprisonment.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 784 [157 Cal.Rptr. 392, 598 P.2d 45].) By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. (*Ibid.*) In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors."[29]

"Liability may also be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and give substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person. [Citations.]"[30]

The court in the present case instructed the jury in accordance with these principles. The court provided instructions regarding Ms. Rand's potential liability as a coconspirator and also instructed the jury on her potential liability as an aider and abettor. The jury found her equally liable with her son for Kesmodel's false arrest and imprisonment.

■ In the previous section we have concluded the act of making a citizen's arrest is not protected communication. Thus, when the arrest is wrongful the act of making the citizen's arrest subjects the citizen to liability for wrongful arrest and imprisonment. The evidence in the present case makes clear beyond dispute that Ms. Rand instigated, encouraged, aided, and assisted the wrongful act by summoning the deputies, falsely asserting Kesmodel had peered into her bedroom, and by making it clear she wanted him arrested when the officers declined to do so themselves. On these facts, we conclude Ms. Rand was properly found liable for her role as a coconspirator in Kesmodel's wrongful arrest and imprisonment.

---

[29] *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510–511 [28 Cal.Rptr.2d 475, 869 P.2d 454].

[30] *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 846 [33 Cal.Rptr.2d 438]. See also 5 Witkin, Summary of California Law (9th ed. 1988) Torts, § 44, page 107 ("Hence, where the complaint charges a conspiracy and the commission of a wrongful act, the only significance of the conspiracy charge is that each member may be held responsible as a joint tortfeasor, regardless of whether or not he directly participated in the act.").

### III. *COCONSPIRATORS MAY BE PROPERLY FOUND JOINTLY AND SEVERALLY LIABLE FOR NONECONOMIC DAMAGES.*

The Rands contend the court erred in imposing liability jointly and severally for both the economic damages and noneconomic damages awarded by the jury. They argue they cannot be jointly liable for the noneconomic damages because under Civil Code section 1431.2 liability for "non-economic damages shall be several only and shall not be joint." Accordingly, the Rands ask this court to modify the judgment to reflect only several liability for the noneconomic damage award consistent with the requirements of the Fair Responsibility Act (Proposition 51).

The Fair Responsibility Act of 1986,[31] popularly known as the "Deep Pocket Initiative," was adopted by initiative measure on June 3, 1986, to change the long-standing common law rule of joint and several liability of multiple tortfeasors. As codified, Civil Code section 1431.2 provides in pertinent part:

"(a) In any action for personal injury, property damage, or wrongful death, *based upon principles of comparative fault*, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant *in direct proportion to that defendant's percentage of fault*, and a separate judgment shall be rendered against that defendant for that amount."[32]

 The statute generally is inapplicable where liability is vicarious.[33] "Much like the defendants within the chain of distribution of a defective product, vicariously liable defendants are viewed, for policy reasons, as a

---

[31] Civil Code section 1431 et seq.

[32] Italics added.

[33] See, e.g., *Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 83 [11 Cal.Rptr.2d 454] ("By its terms, Proposition 51 is unavailing to Stouffer because it is directed at the doctrine of joint and several liability, while Stouffer's liability arises as a consequence of her *status* as Barrientos' employer pursuant to the doctrine of respondeat superior. Nothing in Proposition 51 altered the vicarious liability of an employer under that long-standing doctrine."); *Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 726–728 [28 Cal.Rptr.2d 672] (the landlord had a nondelegable duty to maintain the premises in a safe condition and thus was liable for all damages caused by the dangerous roof repair job); *Rashtian v. BRAC-BH, Inc.* (1992) 9 Cal.App.4th 1847, 1854 [12 Cal.Rptr.2d 411] (vehicle owner is responsible for all damages caused by a permissive user under the authority of Vehicle Code section 17150); *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 633 [65 Cal.Rptr.2d 532] ("[T]he retention of 'joint and several liability' of parties in a defective product's chain of distribution for the plaintiff's full damages without a showing of negligence is essential to the theory of strict product liability.").

single entity."[34] The statute is inapplicable because liability in this context is not based on comparative fault and for this reason there is no liability to compare.[35] By extension, where the substantive law makes each joint actor liable for the act of each other joint actor in causing a plaintiff's indivisible injury—as in the case of a civil conspiracy—the rule of joint and several liability is not abrogated by the provisions of Proposition 51. "[T]he policy of allocating losses to defendants for harm caused by the defendants' joint enterprise justifies dispensing with the requirement that plaintiffs prove the degree of fault of each individual defendant."[36]

Section 15 of the Restatement Third of Torts adopted in 1999 takes this position. Despite most states' abolition of joint and several liability for multiple negligent tortfeasors in favor of comparative fault, the Restatement would still impose joint and several liability for damages caused by persons acting in concert. This section provides: "When persons are liable because they acted in concert, all persons are jointly and severally liable for the share of comparative responsibility assigned to each person engaged in concerted activity."

Comment a to this section explains, "[t]he provision for joint and several liability for persons engaged in concerted action applies regardless of the rule regarding joint and several or several liability for independent negligent tortfeasors in the jurisdiction. . . . In addition, when the persons engaged in concerted action commit intentional torts, the provisions of § 12 also impose

---

[34] *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1197 [74 Cal.Rptr.2d 580].

[35] The jury found Kesmodel's noneconomic damages totaled $27,000. The jury was not asked to make, and did not make, any finding regarding each defendant's percentage of fault. The verdict form simply left blanks next to each defendant's name. The jury used these blanks to assign $13,500, or half of this amount, to Ms. Rand, and the other half, or $13,500, to Michael Rand. For the first time in their reply brief, the Rands assert without supporting authority the jury's action was in essence an attempt to apportion noneconomic damages and for this reason Proposition 51 precludes joint and several liability for the noneconomic damage award.

In this case involving only joint tortfeasors who acted in concert and caused an indivisible injury, it was unnecessary to prove or ask the jury to decide the comparative fault of each defendant. Even so, the jury properly found the Rands equally responsible for Kesmodel's damages within the constraints of the verdict form.

[36] *Arena v. Owens-Corning Fiberglas Corp.*, *supra*, 63 Cal.App.4th at page 1196 (holding Proposition 51 applies in a strict liability asbestos exposure case where multiple products cause the plaintiff's injuries, if the evidence provides a basis to allocate liability for noneconomic damages between the defective products. On the other hand, all defendants in the same chain of distribution of a specific defective product remain jointly and severally liable for all harm caused by that·product).

joint and several liability.[37] Nevertheless, in jurisdictions that have modified or abolished joint and several liability, the rule adopted in this Section imposes joint and several liability on all persons engaging in concerted action and, to that extent, supersedes the abolition or modification of joint and several liability. [¶] The joint and several liability of those engaged in concerted activity is for the total comparative responsibility assigned to all who engage in the concerted activity. . . ."[38]

The Restatement's position on joint and several liability for injury caused by persons who act in concert is consistent with statements in decisions from this state's highest court. For example, the California Supreme Court in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*[39] discussed liability for damages caused by a civil conspiracy. Decided years after adoption of Proposition 51, the *Applied Equipment* court reiterated all coconspirators were liable for all damages caused as a result of the conspiracy. "We have summarized the elements and significance of a civil conspiracy: ' "The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. . . . In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act *responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.*" ' (*Doctors' Co. [v. Superior Court* (1989)] 49 Cal.3d [39,] 44 [260 Cal.Rptr. 183, 775 P.2d 508], citing *Mox Incorporated v. Woods* (1927) 202 Cal. 675, 677–678 [262 P. 302].)"[40]

---

[37] Section 12 of the Restatement Third of Torts provides: "Each person who commits a tort that requires intent is jointly and severally liable for any indivisible injury legally caused by the tortious conduct." This rule "reflect[s] the common law determination that a party who commits intentional misconduct should not be entitled to escape responsibility for damages based upon the negligence of the victim or a joint tortfeasor." (*Weidenfeller v. Star & Garter* (1991) 1 Cal.App.4th 1, 7 [2 Cal.Rptr.2d 14].) For the same reason, Code of Civil Procedure section 875 provides there is "no right of contribution in favor of any tortfeasor who has intentionally injured the injured person." (Code Civ. Proc., § 875, subd. (d).)

Both false arrest and false imprisonment are classified as intentional torts. (See, e.g., Prosser & Keeton on Torts (5th ed. 1984) Intentional Interference with the Person, § 11, p. 47.) The fact the Rands committed an intentional tort in the case at bar reinforces the view joint and several liability properly applies to them, where as joint tortfeasors they not only committed an intentional act, but did so in concert resulting in a single individual harm.

[38] Restatement Third of Torts (1999) Apportionment of Liability, section 15, comment a, pages 128–129.

[39] *Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th 503.

[40] *Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at page 511, italics added; see also, *Monastra v. Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628, 1645 [51 Cal.Rptr.2d 528] ("From this evidence, a trier of fact could find Konica and Digitec participated in a conspiracy to hinder and delay Monastra in his claims against Master Technology, and were thus jointly liable with Gorden for Monastra's damages.").

■ These authorities indicate principles of comparative fault and apportionment based on comparative fault are inapplicable in the context where all tortfeasors act as part of civil conspiracy to commit the same intentional tort. Instead in this circumstance each coconspirator is equally liable for each coconspirator's share of the damages caused by the conspiracy.[41] Accordingly, Civil Code section 1431.2 does not apply to preclude joint and several liability for noneconomic damages caused by joint tortfeasors who act in concert to cause the plaintiff's harm. Because this is what occurred in the case at bar, we find no error.

## DISPOSITION

The judgment is affirmed. Respondent to recover his costs on appeal.

Woods, J., and Zelon, J., concurred.

---

[41] The propriety of imposing joint and several liability on defendants who act as part of a joint enterprise to commit an indivisible injury should be contrasted with situations where the evidence makes it possible to equitably apportion liability between or among negligent and strictly liable tortfeasors, or negligent and intentional actors. (See, e.g., *Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322, 331 [146 Cal.Rptr. 550, 579 P.2d 441] [the jury had no trouble apportioning 80 percent of the fault to Safeway and 20 percent to the manufacturer, even though Safeway's liability was based on negligence and strict liability and the manufacturer's liability was founded solely on strict liability]; *McComber v. Wells* (1999) 72 Cal.App.4th 512 [85 Cal.Rptr.2d 376] [although case involved negligence and intentional torts, the jury assigned a percentage of fault to each defendant and in such circumstances each defendant would be liable for noneconomic damages only to the degree of his percentage of fault as found by the jury].)