Filed 2/18/15; pub. order 3/17/15 (see end. of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| I-CA ENTERPRISES, INC., | No. B243362 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. LC077949) |
| v. | |
| PALRAM AMERICAS, INC., | |
| Defendant and Appellant; | |
| PLASGAD PLASTIC PRODUCTS AGRICULTURAL COOPERATIVE LTD. OF KIBBUTZ GADOT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  James A. Steele, Judge.  Affirmed.

Law Office of Richard L. Weiner, Richard L. Weiner and Stephen M. Astor for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith and Roy G. Weatherup for Defendant and Appellant.

Kevin P. Kane Associates, Inc. and Kevin P. Kane for Defendant and Respondent.

I-CA Enterprises, Inc. (I-CA) appeals from a final judgment following a jury trial on I-CA's claims of tortious interference with contractual relations against defendants Palram Americas, Inc. (Palram) and Plasgad Plastic Products Agricultural Cooperative Ltd. of Kibbutz Gadot (Plasgad). I-CA argues that it was entitled to a finding of joint and several liability against both defendants, rather than a separate award against each defendant. I-CA further argues that the trial court erred in granting a judgment notwithstanding the verdict (JNOV) on the issue of punitive damages as to Palram and a nonsuit on the issue of punitive damages as to Plasgad. Finally, I-CA argues that the prevailing party determination as between I-CA and Plasgad must be reversed and remanded for redetermination.

Palram cross-appeals from the judgment, arguing that no substantial evidence supports the jury verdict against it for compensatory damages on the theory of tortious interference with contractual relations. Finding no error we affirm the judgment.

## FACTUAL BACKGROUND

### The business relationships between the parties

I-CA is a small business incorporated in California in 1993 by husband and wife Adina Aloni and Doron Aloni (Aloni). I-CA stands for Israel-California. I-CA was established for the purpose of importing products from Israel to California.

Palram is a company based in Israel that manufactures and sells corrugated panels in the United States.[1] Palram uses the extrusion method to produce the corrugated panels. The panels were attached to structures with wood closure strips -- also manufactured by Palram -- that matched the corrugation of the Palram panels. In 1993, Palram started trying to sell its products in Home Depot and some other retailers in the do-it-yourself (DIY) market. I-CA opened the first warehouse for Palram in the United States, and started importing the products from Israel.

Sometime in 1997 or 1998, Palram lost to a local wood supplier the business of selling the wood closure strips to Home Depot. Aloni suggested to his contacts at Palram

---

[1]     Palram was first known as Suntuf, Inc., and is sometimes referred to as Suntuf in the record.

2

that a plastic closure strip would be less prone to break and could not be undercut by the local wood supplier. The Palram executives informed Aloni that they could not manufacture such a product because Palram is an extrusion manufacturer, not an injection mold manufacturer. However, Palram had no objection to Aloni exploring this idea. The Palram executives expressed interest in hearing from Aloni later on, after he had the chance to develop the product.

Plasgad is an Israeli-based injection molding plastics manufacturer. In 1999, Aloni attended a trade show for the DIY market in Chicago. There, he met Amnon Shalman (Shalman), a representative of Plasgad. After the trade show, I-CA established a business relationship with Plasgad whereby I-CA agreed to distribute, warehouse, and market Plasgad products on the west coast. At that time, the only product Plasgad sold in the DIY industry was a plastic tub for mixing concrete. Plasgad had no business relationship with Palram.

Aloni invited two Plasgad executives to visit his warehouse in Van Nuys, where he showed them the wood closure strips he was storing for Palram. Aloni told the Plasgad executives about his idea of a plastic closure strip. After the executives' return to Israel, Plasgad informed Aloni that it would like to be the manufacturer for this plastic closure strip, which together they would develop and take a chance on. Plasgad and I-CA worked together for many years to develop the closure strip specifically for Palram products. Plasgad insisted that it must own the patent for the new plastic closure strips. Aloni was agreeable to this, as long as he could be the exclusive North America supplier for the product. Plasgad obtained a patent for the strips on November 26, 2002.

In early 2001, former I-CA marketing manager Norm Cohen had an idea to develop a private label mixing tub for Ace Hardware. Aloni brought the idea to Plasgad, and Plasgad's executives agreed to develop and sell the private label mixing tubs.

On February 20, 2002, a representative of Palram provided a written confirmation letter stating that I-CA would be Palram's sole supplier of the plastic closure strips, and that Palram would be the exclusive distributor of these products in North America and Latin America. The letter agreement was signed by both Palram and Aloni for I-CA.

3

In an email dated February 22, 2002, Plasgad indicated it was acceptable to Plasgad that all purchases of the plastic closure strips in the United States be through I-CA. Palram was aware that I-CA was the exclusive distributor of the strips in North America.

Home Depot decided to sell the plastic strips in its stores. Beginning in 2005, the wood closure strips being sold in all of Home Depot stores in North American were replaced with the plastic strips. During this time, Palram bought 100 percent of the strips that Plasgad was able to manufacture.

On May 8, 2005, Shalman of Plasgad notified Norm Cohen of I-CA that Palram had contacted Plasgad directly. Shalman did not like this, because Palram was putting him in a position where he had to reply. Shalman asked I-CA to "please take care of this issue." Shalman responded to his contact at Palram: "I-CA is our customer and all contacts regarding the closure strips will have to go through them. I am sure you understand that." Aloni also had a conversation with the same contact at Palram and reiterated that if Palram has any issues they must communicate with I-CA. Plasgad was not permitted to "go around" I-CA.

**The written contract between Plasgad and I-CA**

On April 25, 2005, I-CA sent an email to Plasgad suggesting they put in writing all of their verbal agreements relating to the plastic closure strips and the Ace Hardware tubs. This suggestion was due in part to an impending change of leadership at Plasgad. Plasgad agreed and indicated it would start working on a draft.

Plasgad's attorneys prepared an agreement captioned "Marketing and Exclusivity Agreement." The first draft included a provision that allowed Plasgad to work directly with Palram for marketing products outside of the United States. Aloni objected to this provision, and requested that a provision be added prohibiting anyone but I-CA from directly or indirectly distributing the plastic closure strips in North America. Plasgad agreed to this modification and incorporated the change into the final version of the agreement, which both Plasgad and I-CA signed. The final agreement clarified that any merchandise sent to North America had to pass through I-CA. It also provided that the

4

parties would establish sales goals, and compliance with those goals would ensure continued exclusivity for I-CA. The agreement could be terminated by either party upon notice in writing, six months in advance.

**Palram's and Plasgad's business relationships with I-CA end**

In December of 2005, Plasgad increased its prices and asked I-CA to get this change approved by Palram. I-CA engaged in "tough" negotiations with Palram. I-CA informed Plasgad that it was a tough negotiation, and asked Plasgad not to communicate with Palram if Palram approached Plasgad. Ultimately Palram agreed to the price increase. However, I-CA received no orders from Palram for the plastic closure strips between January and August of 2006.

Aloni contacted Palram regarding his concern that there were no orders during the first half of 2006. He spoke with an individual at Palram who said that they had sufficient inventory. In November 2006, the CEO of Palram called Aloni and informed him that Palram was looking for a secondary supplier for the plastic closures. Aloni objected, explaining that there was a patent on the closure and Palram could not purchase it from someone else. Palram's position was that they were looking for a secondary option, and they could do what they wanted. Palram had no alternative plan as to how it would supply Home Depot with the plastic strips.

Within a few days, I-CA informed Plasgad of its conversation with Palram and Palram's position. Plasgad's representative indicated he would check the strength of the patent.

On November 28, 2006, Palram sent I-CA a notice terminating the I-CA contract, effective in 90 days. The president of Palram testified that at the time Palram terminated its contract with I-CA, he did not know that Plasgad had a contract with I-CA.

On December 1, 2006, Plasgad sent I-CA a letter informing I-CA that it would cease supplying I-CA with the plastic closure strips on May 31, 2007. Plasgad explained: "I-CA has unfortunately not achieved the minimum level of sales required to retain the rights to sell these products in the USA." However, no sales goals for the plastic closure strips had ever been established between the parties. In fact, I-CA had always sold

Palram 100 percent of the strips available. Plasgad's manufacturing capability for the product was at 100 percent, and Palram experienced a 21 percent increase in sales of the strips in 2006.

On February 9, 2007, I-CA received its last order from Palram for the plastic closure strips. In February 2007, Plasgad was in discussions with Palram to sell the plastic closure strips directly to Palram. Plasgad began selling the plastic closure strips directly to Palram in 2007.

In August 2007, I-CA discovered that Ace Hardware was purchasing the plastic mixing tubs directly from Plasgad. Ace inadvertently sent a purchase order to I-CA indicating that Plasgad was going directly to Ace with the mixing tubs. Plasgad has had no business relationship of any kind with I-CA from mid-2007 through the present. From 2007 through the present, Plasgad has been selling the plastic closure strips directly to Palram.

**I-CA claims an offset for the breach**

On advice of legal counsel, I-CA determined that as a consequence of Plasgad's actions, I-CA could offset the amounts that came due to Plasgad for the plastic closure strips. Thus, after February 2007, I-CA declined to pay outstanding sums due for the strips. At trial, I-CA acknowledged the amount owing to Plasgad but believed it was owed more due to Plasgad's conduct.

**I-CA's business collapses**

I-CA suffered a significant financial setback due to the loss of the business with the plastic closure strips and the Ace mixing tubs. At the time that Palram and Plasgad shut I-CA out of these businesses, I-CA was attempting to develop a new embedded stone product. However, without the revenue from the strips and tubs, there was insufficient capital to finance the new venture. The Alonis shrank their business and ceased taking salaries from I-CA. Aloni obtained a contractor's license and did his best to supplement the family's income.

# PROCEDURAL HISTORY

## Pretrial pleadings and briefing

On May 14, 2007, I-CA filed a complaint against Palram and Plasgad for breach of contract, tortious interference with contractual relations, and accounting. On August 7, 2009, I-CA filed the operative first amended complaint containing the same causes of action. Each cause of action was separately pled against each defendant. Neither complaint contained allegations of joint and several liability.

Both Palram and Plasgad answered the first amended complaint with a general denial and asserted various affirmative defenses.

Plasgad filed a cross-complaint against I-CA, Aloni, and Adina Aloni. The cross-complaint asserted causes of action for breach of written contract, fraud, reasonable value of goods, money had and received, account stated, book account, open account, and declaratory relief. Plasgad alleged that the Alonis were alter egos of I-CA. Plasgad further alleged that Plasgad and I-CA entered into a contract in 2005 under which I-CA agreed to purchase products from Plasgad and resell them in North America. The contract was terminable at will by either party with six months' notice. After Plasgad gave written notice of its decision to terminate the contract, I-CA and the Alonis refused to pay for products shipped to I-CA. Plasgad alleged that it was owed $327,396.96 plus interest at the time that the contract expired, and that such amount remained unpaid at the time of the filing of the cross-complaint.

I-CA and the Alonis answered the Plasgad cross-complaint, generally denying its allegations and asserting a variety of affirmative defenses, including a claim for offset pursuant to Code of Civil Procedure section 431.70.

Shortly before trial, Plasgad and Palram jointly moved to sever "issues of contractual interpretation concerning mutual at-will termination provision" in their respective contracts with I-CA. In opposition, I-CA abandoned its breach of contract claims against defendants, seeking to proceed to trial only on its contractual interference claims. Because I-CA intended to proceed to trial only on its causes of action for intentional interference with contractual relations, the trial court concluded "[t]his moots

7

the issue of contract termination, as breach is not a required element of [the intentional interference] claim." Plasgad's and Palram's severance motion was denied on the ground that there was no need for court interpretation of the contractual at-will termination provision.

**Phase I of trial**

Trial commenced in January 2012.

Near the end of phase I of trial, the trial court asked the parties to brief the issue of damages. I-CA argued that Palram and Plasgad were joint tortfeasors and that joint and several liability should be imposed upon them. Palram argued that I-CA must prove the actual damages caused by each defendant. Because a party cannot interfere with its own contract (citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514 (*Applied*)), I-CA could only seek from Palram damages for its interference with the I-CA/Plasgad contract, and could only seek from Plasgad damages for its interference with the I-CA/Palram contract. Because I-CA's expert was unable to allocate damages between the two defendants, Palram asked that the testimony be stricken as speculative.

In an order dated January 27, 2012, the trial court agreed with defendants that any damages would not be joint and several. The court stated: "It must be remembered that there are two distinct contracts involved and the damages flowing from the breach of each would not seem to be identical. Furthermore, if the jury were to find both defendants liable, they would, in effect, be finding a defendant liable for having interfered with its own contract which is improper." However, the court declined to exclude I-CA's expert's testimony in its entirety, therefore Palram's motion was denied.

The trial court provided the following instruction to the jury on damages:

> "In this case, I-CA Enterprises, Inc. seeks damages from more than one defendant. You must determine the liability of each defendant to [I-CA] separately. If you determine that more than one defendant is liable to [I-CA] for damages, you will be asked to find the total damages, if any, for which each defendant is separately liable. With respect to damages claimed by [I-CA] allegedly arising from the loss of the ACE Hardware tubs business, such damages, if any, may be attributed only to [Palram] and not to [Plasgad]."

8

On January 30, 2012, at the end of phase I of trial, the jury returned a special verdict. The jury found that contracts existed between I-CA and both Palram and Plasgad, that each company knew of the other company's contract with I-CA and intentionally disrupted that contract. The jury found that I-CA was harmed by the disruption and that each company's conduct was a substantial factor in causing that harm. The jury found that Palram and Plasgad were each separately liable to I-CA for $225,137.62. The jury further found that both Palram and Plasgad engaged in the tortious conduct with malice, oppression or fraud.

In a separate special verdict, the jury found that I-CA refused to pay for goods that Plasgad delivered to I-CA. The jury found that I-CA owed $327,396.96 to Plasgad for these goods. The court also awarded Plasgad prejudgment interest on the $327,396.96 plus $89.70 per day until entry of judgment.

**Plasgad's nonsuit in phase II of trial**

Prior to trial, I-CA served discovery seeking to obtain Plasgad's financial information in the event of a punitive damages finding. In November 2011, the parties stipulated that any evidence of the defendants' financial condition would not be admitted until after the jury returned a verdict awarding actual damages and a finding of malice, oppression or fraud.

After phase I of trial, I-CA renewed its request for Plasgad's financial information. Plasgad refused to produce such information, and in February 2012 I-CA filed a motion to compel. I-CA argued that Plasgad had refused to produce its financial information, which was necessary for the jury to consider in awarding punitive damages against Plasgad. I-CA proposed to take the deposition of the custodian of records for Plasgad telephonically, obviating the need for the custodian to travel to California.

On February 23, 2012, the trial court entered an order on the motion. The court found that under Code of Civil Procedure section 1989, a court lacks the power to compel nonresidents to attend trial or to produce documents. The court concluded that it had no power to enforce an order to compel attendance of a party over whom it has no

9

jurisdiction as a result of Code of Civil Procedure section 1989. There was no dispute that Plasgad and its officers and other personnel are nonresidents.

Furthermore, the court held, I-CA's notice to appear was deficient in that it failed to state with specificity the documents to be produced, instead broadly requesting all financial records. I-CA's motion to compel was denied in its entirety. The court noted, "To the extent [Plasgad] has been relieved of an obligation to comply and produce, that situation is attributable, in whole or at least in large part, to [I-CA's] apparent lack of diligence and preparation. It is almost inconceivable that this court has been forced to deal with this issue at this stage given that fact that this case has been pending for almost [five] years and [I-CA] has at all times known it was dealing with at least one entity defendant domiciled in a foreign jurisdiction."

As a consequence of the trial court's ruling on its motion to compel, I-CA had insufficient evidence of Plasgad's net worth and financial condition for the purpose of proving punitive damages. I-CA attempted to offer the testimony of its economic expert that Plasgad's financial condition was as reported in Dun & Bradstreet (D&B). Plasgad filed an ex parte application to prevent this testimony, which the court granted, finding that the information was inadmissible hearsay.

Under the circumstances, the trial court granted Plasgad's motion for nonsuit on I-CA's claim for punitive damages and excused its counsel from participation in phase II.

**Phase II as to Palram**

Phase II of trial proceeded as to Palram only. The jury awarded punitive damages against Palram in the sum of $3 million.

**Posttrial motions**

Palram moved for JNOV. Palram argued that there was no basis for joint and several liability, that the damages were never allocated as to each defendant, and that punitive damages were improper and excessive. Palram argued that there was no evidence of oppression, fraud or malice and that the punitive damages award was unconstitutionally excessive. Palram also filed a motion for new trial on the same grounds as the JNOV motion.

10

On July 2, 2012, the court heard argument on Palram's JNOV motion and motion for new trial. It also heard argument on I-CA's motion for entry of a judgment of joint and several liability in the amount of $450,275.75, and on Plasgad's motion for a determination that it was the prevailing party against I-CA.

The trial court denied I-CA's motion for entry of a joint and several judgment. The court relied on the rule set forth in *Applied, supra*, 7 Cal.4th at page 510, that a party cannot be held liable for conspiracy to interfere with its own contract. The court stated that "it is difficult to understand how these defendants could be jointly and severally liable for damages when to do so, would be to hold each responsible, in part, for damages associated with interference with its own contract."

Plasgad's motion that it be deemed the prevailing party was granted, thereby permitting Plasgad to recover costs of suit. The court reasoned that Plasgad was the party that obtained the net recovery. Because the net recovery was favorable to Plasgad, Plasgad was entitled to its costs.

Palram's motion for new trial was denied, but its JNOV motion was granted as to punitive damages only. The court held that the jury's verdict as to punitive damages was "seriously problematic for a number of reasons relating to both the initial finding and the amount ultimately awarded." First, the court noted that punitive damage awards in California are not to exceed 10 percent of a defendant's net worth. (Citing *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128.) Here, the jury's $3 million verdict was over 21 percent of Palram's net worth of approximately $14 million.

Further, viewing the evidence in the light most favorable to I-CA, the court found that as to each of the grounds advanced by I-CA as the jury's basis for a finding of malice, oppression or fraud, the court found "no substantial evidence to support such findings of malice, oppression or fraud."

**Judgment**

The court entered a final judgment on July 3, 2012. Separate awards were entered in favor of I-CA against Palram and Plasgad in the amount of $225,137.62 plus prejudgment interest. A third monetary award was made in favor of Plasgad and against

I-CA for breach of contract in the amount of $327,396.96, plus prejudgment interest in the amount of $157,778.41. It was further ordered that the award in favor of Plasgad should be offset against the award in favor of I-CA, resulting in a net recovery to Plasgad of $260,604.48.

I-CA was awarded costs against Palram as the prevailing party, but Plasgad was awarded costs against I-CA as the prevailing party.

After phase III of trial, which commenced on August 30, 2012, judgment was entered in favor of the Alonis on the cross-complaint against them by Plasgad with respect to the alter ego claims. The court found that Plasgad had failed to carry the burden of proof on these claims.

**Appeal and cross-appeal**

On August 14, 2012, I-CA appealed from the judgment entered July 3, 2012, from the partial JNOV as to punitive damages in favor of Palram, and from other orders and rulings.

On August 31, 2012, Palram cross-appealed from the judgment of July 3, 2012, and from all intermediate orders and rulings.

## DISCUSSION

## I.  Direct appeal

### A.  *Joint and several liability*

I-CA's first argument is that it was entitled to a joint and several judgment against both defendants in the amount of $450,275.25. As set forth above, the trial court concluded that Plasgad and Palram could not be held jointly and severally liable when to do so would be to hold each responsible, in part, for damages associated with interference with its own contract. We review this legal ruling de novo. (*Acosta v. SI Corp.* (2005) 129 Cal.App.4th 1370, 1374 [issue of law on undisputed facts is subject to de novo review].)

#### 1.  General legal principles regarding joint and several liability

In *Kesmodel v. Rand* (2004) 119 Cal.App.4th 1128 (*Kesmodel*), the Second Appellate District concluded that section 15 of the Restatement Third of Torts adopted in

12

1999 "is consistent with statements in decisions from this state's highest court." (*Kesmodel, supra*, at p. 1144.)  The section states:  "'When persons are liable because they acted in concert, all persons are jointly and severally liable for the share of comparative responsibility assigned to each person engaged in concerted activity.'"  (*Id.* at p. 1143.)  Comment a to the section explains "'[t]he joint and several liability of those engaged in concerted activity is for the total comparative responsibility assigned to all who engage in the concerted activity. . . .'"  (*Id.* at p. 1144, fn. omitted.)

The concept of joint and several liability is only applicable where the plaintiff's injury is "indivisible."  (*Kesmodel, supra*, 199 Cal.App.4th at p. 1143.)  In *Applied*, the Supreme Court discussed the concept of conspiracy and concluded that where a civil conspiracy is present, ""each participant in the wrongful act [is] responsible as a joint tortfeasor for all damages ensuing from the wrong.""  (*Applied, supra*, 7 Cal.4th at p. 511.)  However, "[t]he propriety of imposing joint and several liability on defendants who act as part of a joint enterprise to commit an indivisible injury should be contrasted with situations where the evidence makes it possible to equitably apportion liability between or among negligent and strictly liable tortfeasors, or negligent and intentional actors.  [Citations.]"  (*Kesmodel, supra*, at p. 1145, fn. 41.)

In *Applied*, the Supreme Court addressed the question of whether a contracting party can be held liable in tort for interference with its own contract.  It answered this question in the negative.  (*Applied, supra*, 7 Cal.4th at p. 508.)  Thus, in the present matter, neither Plasgad nor Palram can be liable for any damages associated with any interference with its own contract.  Each defendant can only be liable for interference with the other defendant's contract.  Where, as here, each actor is responsible for an independent tort, liability may be apportioned between the two and the concept of joint and several liability is inapplicable.

### 2.  I-CA did not allege conspiracy

In *Kesmodel*, the plaintiff alleged false imprisonment and conspiracy against two neighbors.  The *Kesmodel* court explained, "'[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a

13

tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.'" (*Kesmodel, supra*, 119 Cal.App.4th at p. 1141.) Because the two neighbors were found to have engaged in a conspiracy, the *Kesmodel* court concluded that joint and several liability was appropriate: "in this circumstance each coconspirator is equally liable for each coconspirator's share of the damages caused by the conspiracy." (*Id.* at p. 1145, fn. omitted.)

I-CA did not allege a conspiracy theory, and the jury did not find that the elements of a conspiracy existed.[2] I-CA acknowledges that it did not allege a civil conspiracy against Palram and Plasgad, but instead focused on the independent wrongful acts of Palram and Plasgad in interfering with the other entity's contract.

Having failed to allege and prove a civil conspiracy, I-CA now attempts to argue that its evidence against Palram and Plasgad showed "collusion," or "agreement" between these two entities. I-CA first contends that it proved to the jury that the actions of Palram and Plasgad were "collusive." I-CA has not provided a citation to the record indicating where the jury made a finding of collusion.

I-CA further points to evidence which, I-CA claims, supports the jury's "implicit" finding that the two separate torts happened by "agreement." I-CA asserts that it demonstrated that the defendants had an agreement to terminate both contracts, and that they embarked on a deceitful plan to hide their concerted acts from I-CA. Again, I-CA has not provided a citation to the record showing where the jury made a finding that Palram and Plasgad had an agreement to engage in the contractual interference.

Furthermore, I-CA's references to evidence of collusion and agreement between the parties is insufficient to support the application of joint and several liability. I-CA failed to assert a conspiracy theory in the trial court, and failed to obtain any specific findings regarding concerted action. Thus, there is no basis for joint and several liability.

---

2    The elements of a civil conspiracy are: "(1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from an act done in furtherance of the common design. [Citation.]" (*Thompson v. California Fair Plan Assn.* (1990) 221 Cal.App.3d 760, 767.)

14

### 3. I-CA's damages were not indivisible

I-CA argues that regardless of the theory of liability, I-CA's damages were indivisible, thus joint and several liability is appropriate. The damages were loss of profits flowing from two products that I-CA was instrumental in creating: the plastic closure strips and the Ace mixing tubs. According to I-CA, such damages were indivisible, and joint and several liability must be imposed.

I-CA's argument is not supported with any legal or logical rationale as to why its loss of profits could not be divided between the two entities. In fact, the jury did divide the damages between Plasgad and Palram. Each defendant was responsible for the portion of I-CA's total damages arising from its interference with the other defendant's contract. However, each defendant was specifically precluded by law from being held liable for the damages arising out of the interference with its own contract. (*Applied, supra*, 7 Cal.4th at p. 508.) Under the circumstances, the jury's decision to hold each defendant liable for 50 percent of I-CA's total damages was acceptable.

Contrary to I-CA's position, the cases cited by the trial court support apportionment of the liability in this case. The first, *Connor v. Grosso* (1953) 41 Cal.2d 229, was an action for damages where the defendant had dumped dirt on the plaintiff's property. The court found that the defendant could only be held liable for the dirt that he actually dumped: "Since Grosso did not act in concert with the other persons dumping dirt on the Connor land, he cannot be required to pay for removal of the dirt dumped by them. [Citation.]" (*Id.* at p. 232.) Similarly, in *California Orange Co. v. Riverside Portland Cement Co.* (1920) 50 Cal.App. 522, two cement companies wrongfully operated their cement plants in such a way as to deposit cement dust on the plaintiff's orange grove. The court found that the two cement companies were not joint tortfeasors, and "[t]heir respective torts, . . . were several when committed, did not become joint merely because of a commingling of the dust from the respective plants and a union of the consequences proceeding from the several and independent tortious acts. [Citations.]" (*Id.* at p. 524.) In determining the amount of damages to be assessed against one defendant, the trial court was "at liberty to estimate, as best it could, from the

15

evidence before it, how much of the total damage, caused by the operations of the two cement companies, was occasioned by defendant's plant." (*Ibid.*) Finally, in *Griffith v. Kerrigan* (1952) 109 Cal.App.2d 637, seepage from the defendant's rice fields combined with seepage from nearby canals produced injury to the plaintiff's land. (*Id.* at p. 638.) Under the circumstances, the court held apportionment of damages to be appropriate. (*Id.* at pp. 639-640.)

These cases illustrate that independent wrongs do not become joint even if the damages resulting from the wrong add up to one particular type of damage. Here, the damage to I-CA was its loss of profits. The jury was at liberty to determine how much of that damage was attributable to the tort of each individual defendant.

### 4. The court did not misconstrue the jury verdict

I-CA argues that it is clear from reading the jury verdict that the jury found total damages of $450,275.25, then divided that total in half. I-CA argues that the court should have entered judgment in accordance with the verdict, because the sum of $450,275.25 was indivisible.

We find that the jury verdict forms do not support I-CA's theory that the jury found total damages of $450,275.25. The jury did what it was instructed to do. It determined the liability of each defendant separately.

Even if the jury had referenced a total damages figure of $450,275.25 -- which it did not -- damages were properly apportioned in this case between the two defendants. I-CA has failed to convince us that there is a sound legal basis for joint and several liability in this case.

### B. The Palram JNOV

I-CA next attacks the trial court's decision to grant Palram's JNOV motion in part as to punitive damages. The trial court determined that there was insufficient evidence of malicious, oppressive or fraudulent conduct to sustain the jury's punitive damage award.

### 1. Standard of review

"A motion for judgment notwithstanding the verdict may properly be granted only when, disregarding conflicting evidence and indulging in every legitimate inference

16

which may be drawn from plaintiff's evidence, the result is a determination that there is not evidence sufficiently substantial to support the verdict. On appeal, we must read the record in the light most advantageous to plaintiff, resolve all conflicts in his favor and give him the benefit of every fact pertinent to the issues involved and which may be reasonably be deduced from the evidence. [Citation.]" (*Bufano v. San Francisco* (1965) 233 Cal.App.2d 61, 68.)

### 2. The trial court's ruling

The trial court provided a detailed ruling setting forth its rationale for granting the JNOV as to punitive damages. The trial court considered the five grounds which I-CA claimed supported the jury's finding that Palram had been guilty of oppression, fraud, or malice. Those grounds were: "(1) [Palram executive] Ron Dvir's testimony that he knew the strips were protected by a patent and yet Palram was supposedly prepared to infringe on the patent by having the strips copied; (2) Palram claimed that it was not going to allow exclusive agreements because it, and it alone, decided who it was going to purchase from; (3) Palram stated that after its termination of I-CA, that I-CA should have sold directly to Home Depot, even though Palram knew full well that this would have been interference with Palram's contractual relationship with Home Depot; (4) Palram's smearing of Doron and Adina Aloni by accusing them of theft without offering a shred of evidence in support; and (5) Palram's continuing withholding of financial information during the punitive damages phase of trial."

The trial court concluded that, viewing this evidence in the light most favorable to I-CA, it did not support the jury's finding of malice, oppression, or fraud. "Mr. Dvir's testimony was not indicative of any fraud, oppression, or malice. The exclusivity provision of the subject agreement was removed in 2005 at I-CA's request and I-CA was free to sell anywhere in North America. Due to the nature of the contract there was no requirement of any specific purchases and the failure to place orders during any particular period, in the context of an at-will contract, did not constitute despicable conduct or other any such egregious conduct."

17

As to the purported theft of inventory, "Palram continued to do business with I-CA for seven years after the inventory shortages. Mr. Seiffert never accused the Alonis of any such theft and no investigation was ever undertaken of the Alonis as to same."

The trial court noted that, in evaluating the relationship between I-CA and Palram as a whole, there was evidence that mitigated any purported reprehensibility on the part of Palram. The court noted that I-CA itself had engaged in deceitful conduct by continuing to receive product from Plasgad for which it had no intention of paying.

The court stated: "[W]ithout any substantial evidence to support its finding of fraud, oppression or malice, certainly not even remotely by the requisite clear and convincing evidence standard, the jury then awarded $3,000,000.00 in punitive damages against Palram; the precise amount asked for by [I-CA]. Even assuming, for argument's purposes, there had been substantial evidence supporting a finding of conduct to justify imposition of punitive damages, the amount awarded still would have been out of the bounds of reason."

The court also noted, while it was not the primary basis upon which the court granted the partial JNOV, its belief was that the punitive damage award resulted from passion and prejudice. The court noted that the punitive damages verdict of $3 million was followed by multiple exclamation marks. The court felt that "[t]he jury's prejudice was contributed to, if not entirely caused by, the jury's obvious dislike for defense counsel and their trial conduct." At one time during trial, a juror asserted her own Evidence Code section 352 objection, "with which many of the jurors obviously concurred as evidenced by their collective grumblings in agreement." The trial court also noted that Palram's counsel compounded the problem by insulting the jury, and stating that the jury had "wasted its time and its mistake in finding liability in Phase I against Palram." I-CA's counsel subsequently pointed out this "insult" to the jury during its closing argument. In the opinion of the trial court, all of this inflamed the jury's passions.

In addition, the trial court found that the manner in which Palram's financial condition evidence was produced, and how it was handled at trial, further supported the

18

partial JNOV. The court felt there were too many unnecessary references to related entities, which led it to conclude that I-CA "intended to place . . . emphasis on the other entities, not to provide context or background, but to prejudice Palram by creating in the jury's mind that Palram Americas, although with offices in Pennsylvania, was not only Goliath, but that, unlike I-CA whose business was a mile or two from the courthouse, it was just a small part of a myriad of foreign businesses doing business all over the world who were all doing business under a Palram umbrella." The court also noted that at trial, I-CA inquired of Palram's witness why certain notes to financial statements were not produced. The court insisted that the jury was not to hear anything further on the withholding of any notes or financial information. Nevertheless, in closing argument I-CA's counsel "spent substantial time castigating . . . Palram for failing to produce certain financial information." The court felt that there was no willful suppression of evidence, although I-CA insisted that there was.

Finally, the trial court was concerned that the jury punished Palram for wrongdoing by Plasgad. After Plasgad's motion for nonsuit as to punitive damages was granted, "the jury had only Palram before it." It was the court's belief "that Palram is correct in that the absence of Plasgad in Phase II, attributable to plaintiff's lack of diligence, worked to Palram's ultimate and significant prejudice."

For all of these reasons, the trial court concluded that no substantial evidence supported the finding of punitive damages against Palram, and that the punitive damage award was the result of passion, prejudice and/or application of an improper standard. The JNOV as to punitive damages was granted.

### 3. I-CA's arguments on appeal

On appeal, I-CA points to the same evidence that the trial court considered. First, when Palram initially told I-CA it was looking for another supplier for the plastic closure strips, it knew that the strips were patented, and that there could never be a secondary supplier. I-CA states that the jury could easily have seen this as "nothing more than a smokescreen designed to set the stage for Palram's direct dealings with Plasgad."

19

In determining whether such a "smokescreen" may form the basis for punitive damages, we look to the definitions found in Civil Code section 3294, subdivision (c) which provides:

> "(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.
>
> "(2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.
>
> "(3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

I-CA's use of this smokescreen does not fit the definition of malice. A statement that Palram was looking for another supplier could not cause injury to I-CA. It is merely a statement that it is looking to do something. Nor does the statement constitute oppression, as it did not subject anyone to cruel and unjust hardship. The only remaining question is whether the statement could constitute fraud.

While it may be viewed as an intentional misrepresentation, Palram's statement that it was looking for another supplier cannot be said to have been made with the intention to deprive I-CA of property or legal rights or of causing injury. I-CA lists no specific action that it took to its own detriment in response to the statement. Nor were there any direct consequences to I-CA from Palram's statement that it was looking for a secondary supplier. If anything, it provided Palram with an opportunity to attempt to avoid disruption of its business. We therefore find that Palram's statement that it was looking for a secondary supplier, is not evidence of malice, oppression or fraud sufficient to support an award of punitive damages.

I-CA also points out that when Palram terminated I-CA, it did so pursuant to a nonexistent 90-day termination notice. In addition, Palram "pretended" that it had no alternative plan as to how it would continue to supply Home Depot with the strips. I-CA

20

argues that to this day Palram has never used a secondary supplier because that was never its intent.

Again, while deceitful, these actions do not amount to malice, oppression, or fraud. While there is a level of deceit that is evident from Palram's actions in pretending that it had another alternative, this pretense did no harm to I-CA, as required by Civil Code section 3294.

I-CA next points to evidence that during the first seven months of 2006, soon after Home Depot made its decision to replace all the wood strips with plastic strips, Palram suddenly ceased ordering the strips from I-CA. I-CA argues that this action served to set up Plasgad's fraudulent claim that I-CA failed to meet nonexistent sales goals. However, I-CA does not take issue with the trial court's finding that there was no contractual requirement regarding any specific purchases. Thus, the failure to place orders during any particular period, in the context of an at-will contract, did not constitute despicable conduct or any other such egregious conduct. Where Palram was not contractually bound to place orders, its conduct in declining to place orders cannot be considered malicious, oppressive, or fraudulent. As to I-CA's argument that Palram was colluding with Plasgad to set up Plasgad's later claim that I-CA was not meeting sales goals, I-CA has failed to cite any evidence at all of such collusion.

I-CA argues that the jury heard evidence of Palram's unfounded effort to shift the blame to I-CA for Palram's termination of the contract. I-CA claims that Palram alleged that the Alonis were thieves, and that years earlier they had been stealing inventory from Palram. I-CA claims that this callous willingness to disparage the reputation of the Alonis was impossible for the jury to ignore. However, I-CA completely ignores the trial court's specific findings on this issue. The trial court noted that Palram never accused the Alonis of theft. No investigation was ever undertaken, and Palram never asserted any claim against I-CA for such conduct. Palram never even attempted to impose any offsets against amounts owing by I-CA. I-CA does not challenge these factual findings made by the trial court. Nevertheless, "[I-CA] took the position during trial that this subjective and un-acted upon belief on [Palram's] part, was itself reprehensible."

21

We agree with the trial court that a belief that is not acted upon cannot provide the basis for a finding of malice, oppression or fraud.

Finally, I-CA accuses Palram of "manufacturing" a story about how Aloni was negligent in not calling certain Palram executives upon receipt of Palram's termination letter, although Aloni's relationship was not with those particular executives but was with Amos Netzer in Israel. I-CA claims that Palram hoped the jury would find this conduct to be reckless, and was designed to shift blame to I-CA for the disruption of its relationship with Palram. I-CA provides no authority for its position that a party's advancement of a theory at trial may form the basis for an award of punitive damages.

None of the evidence advanced by I-CA in support of an award of punitive damages meets the definition of malice, oppression or fraud set forth in Civil Code section 3294. We therefore find that the trial court did not err in granting Palram's JNOV on the issue of punitive damages.[3]

### C. The Plasgad nonsuit

I-CA next argues that the Plasgad nonsuit must be reversed. The trial court granted the nonsuit in favor of Plasgad because there was no evidence of Plasgad's

---

[3] I-CA also argues that the trial court largely based its JNOV ruling on entirely irrelevant matters, such as unrelated evidence that the court believed mitigated Palram's reprehensibility, discussion of whether the award was excessive, and the jury's supposed dislike of Plasgad's counsel. Because we have determined that the evidence presented was insufficient as a matter of law for imposition of punitive damages, we need not address I-CA's arguments as to the impropriety of the alternative reasons for its JNOV ruling that the trial court discussed.

In particular, I-CA argues that the trial court relied on certain evidence of collaboration between Plasgad and Palram behind I-CA's back -- evidence that was stricken from the record over I-CA's objection. I-CA argues that this evidence was improperly stricken from the record. We find that I-CA has failed to support this argument with reasoned argument and citations to legal authority. I-CA has failed to set forth the statutory basis for the exclusion of the evidence or provide any legal authority explaining the trial court's alleged error. "'The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' [Citations.]" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) We therefore decline to address I-CA's argument that this evidence was erroneously stricken from the record.

22

financial condition. Without competent evidence of Plasgad's net worth or financial condition, an award of punitive damages cannot stand. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109 ["an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition"].)

I-CA argues that the trial court erred in refusing to compel Plasgad to produce its financial information, and by excluding other admissible evidence of Plasgad's net worth.

### 1. No error err in denying I-CA's motion to compel financial information

#### a. The trial court's rationale

The trial court gave several reasons for its decision to deny I-CA's motion to compel Plasgad's financial information. First, the court referenced Code of Civil Procedure section 1989, which provides: "A witness . . . is not obliged to attend as a witness before any court, judge, justice or any other officer, unless the witness is a resident within the state at the time of service." The court concluded, based on *Amoco Chemical Co. v. Certain Underwriters at Lloyd's of London* (1995) 34 Cal.App.4th 554, 555 (*Amoco*), that a court cannot compel a nonresident to attend trial. The court further concluded that "[a] court similarly lacks power to compel a non-resident to produce documents because Code of Civil Procedure section 1989 'makes the right to request documents contingent upon the requesting party's right to request the appearance of a party" (citing *Amoco* at p. 560). The court concluded that it had no power to compel the production of documents situated in Israel.

Additionally, the trial court held I-CA's discovery notice was "severely deficient." The court noted that "[I-CA] has not stated with any measure of specificity the documents to be produced, instead broadly requesting all balance statements, profit and loss statements, financial documents, and the like." This failure put I-CA out of compliance with Code of Civil Procedure section 1987, subdivision (c) which requires a listing of the exact materials or things to be produced.

The court further ordered that I-CA would not be permitted to comment in front of the jury as to Plasgad's failure to produce evidence on the subject of its wealth. The

23

court noted, "To the extent [Plasgad] has been relieved of an obligation to comply and produce, that situation is attributable, in whole or at least in large part, to [I-CA's] apparent lack of diligence and preparation. It is almost inconceivable that this court has been forced to deal with this issue at this stage given the fact that this case has been pending for almost [five] years and [I-CA] has at all times known it was dealing with at least one entity defendant domiciled in a foreign jurisdiction."

### b. Code of Civil Procedure section 1989

I-CA has declined to cite or discuss Code of Civil Procedure section 1989 in its briefs to this court. Therefore any challenge to the trial court's reliance on that section, or the court's interpretation of that section, is forfeited.

I-CA has briefly addressed the cases cited by the trial court. I-CA attempts to distinguish *Amoco* on the ground that the *Amoco* court did not discuss Code of Civil Procedure section 2025.230, upon which I-CA relied.[4] Instead, the case focused on the obligation of a witness to appear in court in California if he is not a resident of California at the time of service.

While *Amoco* did not directly discuss the application of Code of Civil Procedure section 1989 to deposition witnesses, the issue was discussed in *Toyota Motor Corp. v. Superior Court* (2011) 197 Cal.App.4th 1107 (*Toyota*). The *Toyota* court held, "[Code of Civil Procedure] section 1989 applies not only to those witnesses obliged to attend as witnesses in court proceedings, but those witnesses obliged to give testimony by deposition before deposition officers." (*Id.* at p. 1113.)

I-CA points out that, in a footnote, the *Toyota* court declined to express an opinion as to whether Code of Civil Procedure section 1989 applies to section 2025.230.

---

**4**    Code of Civil Procedure section 2025.230 provides: "If the deponent named is not a natural person, the deposition notice shall describe with reasonable particularity the matters on which examination is requested. In that event, the deponent shall designate and produce at the deposition those of its officers, directors, managing agents, employees, or agents who are most qualified to testify on its behalf as to those matters to the extent of any information known or reasonably available to the deponent." Thus, I-CA was seeking to depose a person most knowledgeable (PMK) on Plasgad's financial condition.

24

Specifically, the *Toyota* court stated: "We express no opinion . . . as to whether our analysis or the conclusions we have reached in this opinion would or should extend or apply to a court order made pursuant to [Code of Civil Procedure] section 2025.230 which provides for the circumstances where '. . . the deponent named is not a natural person . . . .'" (*Toyota, supra*, 197 Cal.App.4th at pp. 1125-1126, fn. 20.)

Aside from pointing out this footnote, I-CA has declined to make any reasoned arguments as to why Code of Civil Procedure section 1989 should not apply when the deposition has been noticed under section 2025.230, as opposed to any of the other discovery statutes.

We note that the *Toyota* court also made reference to *Twin Lock, Inc. v. Superior Court* (1959) 52 Cal.2d 754 (*Twin Lock*). In *Twin Lock*, the plaintiff, Twin Lock, Inc., was a resident of New York suing California defendants in a lawsuit filed in Los Angeles. The defendants gave notice that they would depose certain officers of Twin Lock in Los Angeles.[5] Twin Lock moved to vacate the deposition notice, and the trial court denied the motion. The defendants sought imposition of sanctions based on the officers' willful failure to appear. (*Id.* at pp. 757-758.) On appeal, Twin Lock sought a writ of prohibition to prevent the imposition of sanctions for its officers' failure to appear for the depositions.

The Supreme Court stated: "The disposition of this proceeding depends upon the applicability of section 1989 of the Code of Civil Procedure." (*Twin Lock, supra*, 52 Cal.2d at p. 758.) Twin Lock asserted that under Code of Civil Procedure section 1989, "no form of compulsion, including the use of sanctions against a party, may be used by the court to compel the New York residents to come to California." (*Ibid.*) The high court evaluated Code of Civil Procedure section 1989, noting that "[t]he word 'witness' in section 1989 includes a prospective witness who is a party or who is a director, officer, or managing agent of a party." (*Twin Lock*, at p. 759.) The court concluded that Code of Civil Procedure section 1989 was "by its terms applicable to the New York residents

---

[5] The deposition notice was based on Code of Civil Procedure section 2019, which was repealed in 2004.

25

involved here." (*Ibid.*)  The court held that the trial court was "without power to impose sanctions upon Twin Lock based upon the notice which defendants gave for the taking of the depositions in Los Angeles of the New York residents."  (*Id.* at pp. 761-762.)

I-CA has declined to cite or discuss *Twin Lock*.  The case supports the trial court's determination that it had no power to compel production of Plasgad's financial records or to compel a deposition of Plasgad's nonresident PMK.  Under the circumstances, I-CA has provided no grounds for reversal of the trial court's order.[6]

### c. *Timeliness of I-CA's request*

As an alternative rationale for its decision, the trial court noted I-CA's lack of diligence and preparation in failing to raise this discovery issue until the eve of the punitive damages phase of trial.  I-CA argues that parties and courts routinely defer discovery of financial information until after the jury has returned a verdict with punitive damages findings.  I-CA cites *Zhadan v. Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839 for the proposition that "the jury should make its determination of the punitive damages based on the defendant's net worth at the time of trial."  The defendant had argued that its net worth at the time of injury was the proper figure to submit to the jury.  The court disagreed, confirming that the proper figure was net worth at the time of trial.  However, the court did not specify at what stage of trial the information should be collected; therefore, the case does not support I-CA's position that discovery of financial information should be delayed until after the jury has returned a verdict with punitive damages findings.

I-CA also cites *Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 119 (*Kerner*) for the proposition that "[p]retrial discovery of a defendant's financial condition in connection with a claim for punitive damages is prohibited absent a court order permitting such discovery."  This is accurate, but does not explain why I-CA did not seek

---

**6**     The parties' stipulation that evidence of profit and financial condition would be presented after a finding of malice, oppression or fraud, does not change the result.  The parties' stipulation does not purport to confer authority upon the court to compel Plasgad to produce documents located in Israel.

such an order prior to trial. As explained in *Kerner*, a plaintiff who believes that there is a substantial probability that the plaintiff will prevail on its punitive damages claim must seek such a court order in order to obtain the supporting information. Civil Code section 3295, subdivision (c), provides:

> "No pretrial discovery by the plaintiff shall be permitted with respect to the evidence referred to in paragraphs (1) and (2) of subdivision (a) unless the court enters an order permitting such discovery pursuant to this subdivision. . . . Upon motion by the plaintiff supported by appropriate affidavits and after a hearing, if the court deems a hearing to be necessary, the court may at any time enter an order permitting the discovery otherwise prohibited by this subdivision if the court finds, on the basis of the supporting and opposing affidavits presented, that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294."[7]

Thus, the statute makes it clear that a party desiring discovery of a defendant's financial information must bring a motion in order to obtain such information. Then, the trial court must determine whether the plaintiff has established a "substantial probability" of prevailing on the claim for punitive damages. (Civ. Code § 3295, subd. (c).) "In this context, a 'substantial probability' of prevailing on a claim for punitive damages means that it is 'very likely' that the plaintiff will prevail on such a claim or there is a '"strong likelihood"' that the plaintiff will prevail on such a claim." (*Kerner, supra*, 206 Cal.App.4th at p. 120.)

In *Kerner*, the Court of Appeal determined that the trial court erred in granting the motion for pretrial discovery regarding financial information because the plaintiff did not have a substantial probability of prevailing on his claim for punitive damages. The punitive damage claim was based on the defendants' efforts to encourage the city attorney to prosecute the plaintiff for domestic violence. Those acts were privileged under Civil Code section 47, subdivision (b), therefore the trial court erred in considering

---

[7]     Paragraphs (1) and (2) of Civil Code section 3295, subdivision (a), refer to evidence of profits gained through wrongful conduct and evidence of the defendant's financial condition.

27

them in support of its finding that there was a substantial probability that the plaintiff would prevail on his claim for punitive damages. (*Kerner, supra*, 206 Cal.App.4th at pp. 121-122.)

I-CA fails to explain why it did not bring a motion for pretrial discovery of financial information, as the plaintiff in *Kerner* did. No such motion was made until after phase I of trial, at which time the trial judge felt that it was not only improper, it was too late.

*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597 (*Issod*), does not suggest otherwise. There, an individual diamond dealer, whose place of business was in Los Angeles, was ordered to produce records of his net worth in court following a trial in which the diamond dealer was found liable for fraud. The diamond dealer objected that such documents had not been requested during discovery, nor subpoenaed for trial. The trial court overruled those objections. (*Id.* at pp. 603-604.) On appeal, the appellate court rejected the defendant's argument that plaintiff's failure to conduct pretrial discovery precluded the plaintiff from obtaining a court order requiring the defendant to produce his financial records at trial. (*Id.* at p. 609.) The court held: "We see no problem with a trial court, in its discretion, ordering a defendant to produce evidence of his or her financial condition *following* a determination of the defendant's liability for punitive damages." (*Ibid*.)

The *Issod* court's holding that a trial court, in its discretion, *may* order a defendant to produce financial records after trial, does not preclude a trial court from determining, in its discretion, that such an order is inappropriate. This is especially true where, as here, the defendant in question is a foreign corporation, the documents requested were overly broad, and the matter has been pending for almost five years. Under the circumstances, we find no abuse of discretion in the trial court's decision that the discovery request came too late.

## 2. No error in excluding the Dun & Bradstreet report

I-CA next argues that the trial court abused its discretion in excluding a properly authenticated D&B report showing that Plasgad had a $15.6 million net worth.

28

### a. *The trial court's rationale*

As discussed above, this issue came before the trial court in the form of an ex parte application, filed by Plasgad, seeking an order excluding the documents of I-CA's retained expert, David J. Weiner, as to the net worth and/or financial condition of Plasgad. Plasgad argued that the documents were inadmissible hearsay and were an improper basis for any award of punitive damages. Mr. Weiner's testimony was based solely on a D&B report concerning Plasgad.

The trial court granted Plasgad's ex parte application, finding that the D&B report contained "hearsay within hearsay." The first layer of hearsay constituted the financial information supposedly provided by "Yossi Shemer General Manager" (Shemer) of Plasgad. The trial court rejected I-CA's argument that the party-admission exception to hearsay applied.[8] The court described I-CA's claim as "tenuous." The court explained that use of the party-admission exception requires an examination of the agent's authority to make the statement, the nature of the statement in relation to the authority, and the relevance or purpose of the statement. This analysis had not been carried out. Instead, I-CA provided only "a few sentences within the D&B Report which indicate an interview of someone apparently believed to be 'Yossi Shemer[,] General Manager[,'] by one or more unidentified persons who presumably work for D&B . . . . The D&B Report also indicates that 'Fin[ancial] statements for [2010] were shown to D&B economists.'" The trial court determined that I-CA had not adequately shown the elements of an authorized admission.[9]

---

[8]     Under Evidence Code section 1222, an authorized admission is a statement "made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement."

[9]     I-CA provided a declaration of Duane Deitrich, an employee of D&B "in the position of Project Director-National Customer Relations." Deitrich declared that the statements in the D&B report were made "at or near the time of the occurrence . . . by . . . a person with knowledge of those matters"; "[w]ere kept in the course of regularly conducted business activity"; "[w]ere made by the said business activity as a regular practice"; and "[i]f not original records, are duplicates of original records." The trial

The second layer of hearsay was the "out-of-court assertions of unnamed D&B economists," which posed "serious evidentiary problems." I-CA had failed to provide any competent evidence establishing the trustworthiness of the method, source, and preparation of the D&B report. As such, the second layer of hearsay could not qualify for the business records exception.

The trial court concluded that "the problems faced by [I-CA] are numerous." The court summarized its concerns as follows:

> "For instance, the telephonic interview was with someone who may have purported to have been Mr. Shemer, and [I-CA] has failed to show that those conducting the interview, whoever they might be, could, if necessary, actually identify the purported caller. In addition, there is a failure to identify those persons who conducted the interview and their qualifications, as well as a failure to demonstrate that the information memorialized by the interviewer(s) was accurately memorialized and communicated. There is also the vague reference to the 'showing' of the financial statements to the unidentified 'economists.' The court is unable to determine if the financial information set forth in the D&B Report was based upon the information in the telephonic interview, on the financials apparently 'shown,' to a combination of the above, or upon D&B's adjustment of the information it did receive from other unidentified and undisclosed sources. In summary, there are just too many glaring deficiencies for this court to find the source, manner and method of preparation to be trustworthy."

Having found the D&B report to be inadmissible hearsay, the trial court next addressed the question of whether I-CA's expert could still rely on that report in rendering his opinion. The trial court determined that he could not. While an expert may rely on inadmissible matter in forming an opinion, that matter is admissible only to explain the basis for the witness's testimony. (Citing *People v. Gardeley* (1996) 14 Cal.4th 605, 612 (*Gardeley*).) However, the expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay. (Citing *People v. Coleman* (1985) 38 Cal.3d 69, 92, disapproved on other grounds in *People v. Riccardi* (2012) 54 Cal.4th

court found that this declaration was "not in proper form" and "cannot authenticate the underlying information or properly establish the document as a business record."

30

758.) Here, Mr. Weiner's testimony regarding the net worth of Plasgad was "derived directly, and apparently solely from the D&B Report." The trial court concluded, "[b]ecause Mr. Weiner has no other competent basis to testify about Plasgad's net worth or financial condition, any testimony on those subjects would result in the inadmissible D&B Report being introduced to the jury through [I-CA's] expert. This is precisely what the law does not allow."

### b. *No abuse of discretion occurred*

I-CA argues that it is well settled that an expert may rely on reports and market data to establish a company's valuation. I-CA first points to the Law Revision Commission Comments to section 801 of the Evidence Code, which states "[a]n expert on the valuation of real or personal property . . . may rely on inquiries made of others, commercial reports, market quotations, and relevant sales known to the witness."[10]

The trial court acknowledged that "[a] qualified expert may fortify his opinion by reference to materials . . . prepared by similarly qualified experts." The trial court was aware that just because "such independent information/opinions are not themselves admissible does not prevent a testifying expert from relying on them as a basis for his own opinion . . . ."

However, the trial court noted that there are limits to a testifying expert's ability to reference inadmissible hearsay. The trial court relied on *Gardeley*, in which the Supreme Court set forth a thorough discussion of the circumstances under which a testifying expert may rely on inadmissible evidence. The *Gardeley* court acknowledged that "[e]xpert testimony may . . . be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions." (*Gardeley, supra*, 14 Cal.4th at p. 618.) However, the *Gardeley* court emphasized that "a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*Id*. at p. 619.) A trial court has discretion "'to weigh the probative

---

**10** Section 801 of the Evidence Code concerns expert witness opinion testimony.

value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' [Citation.]" (*Ibid.*)

This is exactly the risk that the trial court considered when it made its ruling excluding the D&B report. The trial court stated, "Mr. Weiner cannot, as [I-CA] seeks, serve as a mere conduit for the introduction of otherwise inadmissible hearsay. Here, all of Mr. Weiner's knowledge with regard to Plasgad's net worth or financial condition is derived directly, and apparently solely from the D&B Report." The trial court soundly determined that, because the D&B report was the only evidence of Plasgad's net worth, the jury would use the information contained in the report as independent evidence of Plasgad's net worth. Using its discretion to balance the value of the hearsay against this risk, the trial court excluded the evidence.

I-CA discusses *United States v. Beecroft* (9th Cir. 1979) 608 F.2d 753 (*Beecroft*), in which the Ninth Circuit specifically discussed the admissibility of D&B reports. In *Beecroft*, a D&B report was admitted into evidence. However, it was not hearsay because it was "not introduced to prove the financial condition of [the defendant's company]." (*Id.* at p. 760.) Instead, it was "part of the circumstantial evidence illustrating [a corporate officer's] awareness of the misrepresentations made to inventors via the Dun and Bradstreet report." (*Id.* at p, 761.) Thus, the *Beecroft* case does not suggest that the trial court abused its discretion in this matter.[11]

---

[11]     I-CA argues that the *Beecroft* court specifically determined that the D&B report met the requirements of the business records exception to the hearsay rule. (See Evid. Code, § 1340.) In discussing whether a specific signature on the D&B report was hearsay, the *Beecroft* court stated that even if it were, the elements of the business records exception were met because "(1) the report is timely made in the course of a regularly conducted business activity, and (2) there is no indication of untrustworthiness." (*Beecroft, supra*, 608 F.2d at p. 761.)

The rationale set forth in *Beecroft* does not apply to the report made in this case. As explained above, the trial court found numerous indicia of untrustworthiness in this particular D&B report. In addition to the deficiencies set forth above, the court found it "curious" that "Mr. Shemer, who was present in court and certainly was aware of the verdict and the fact that the jury would be returning for Phase II, would, just two weeks

32

I-CA also argues that Shemer's out-of-court statements were party admissions. I-CA cites *Pleasant Hill v. First Baptist Church* (1969) 1 Cal.App.3d 384, 418 (*Pleasant Hill*) for the proposition that "a party's extrajudicial statement as to value is admissible as substantive proof where value is in issue. [Citations.]"  The statement at issue in *Pleasant Hill* was an allegation in an original verified pleading of $15,000 in damages -- a number which was later changed to $100,000.  (*Id.* at p. 417.)  The case does not suggest that a trial court may not, in its discretion, exclude statements that are "hearsay within hearsay."  In addition, the *Pleasant Hill* court pointed out that such prior inconsistent statements are admissible where "the person whose statement is to be used is a witness and has an opportunity to explain or to deny the statement. [Citation.]"  (*Id.* at p. 418.)  Here, the trial court was skeptical that the information in the D&B report was truly provided by Shemer; in addition, the court could not compel Shemer to appear at trial to be questioned about those statements.  Thus, *Pleasant Hill* does not assist I-CA.[12]

Under the authority set forth in *Gardeley*, the trial court's evidentiary ruling prohibiting use of the D&B report by I-CA's expert was not an abuse of the trial court's discretion.

---

prior to commencement of Phase II, freely share non-public financial information with D&B knowing that such information would then be available to the public."  This added to the trial court's concern that the identities and qualifications of Mr. Shemer's supposed interviewers were not known, nor was it known how they identified the purported interviewee.  In addition to these concerns, the court could not ascertain the methods used for ultimately determining the financial status of Plasgad.  Thus, while some D&B reports may fall under the business records exception to the hearsay rule, the trial court found that this one had too many indicia of untrustworthiness to fit under that exception. This decision, which was carefully considered and documented, was not an abuse of discretion under the circumstances of this case.

[12]    The other cases cited by I-CA on the doctrine of party admission similarly do not address the double hearsay situation involved here.  (*Bonebrake v. McCormick* (1950) 35 Cal.2d 16, 18-19; *Sill Properties, Inc. v. CMAG, Inc.* (1963) 219 Cal.App.2d 42, 54-55; *Bank of Italy Nat'l Trust & Sav. Asso. v. Johnson* (1935) 7 Cal.App.2d 463, 465; *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316.)

### D. *The prevailing party determination between I-CA and Plasgad*

I-CA next argues that the trial court's determination that Plasgad was the prevailing party as between I-CA and Plasgad was error. However, I-CA's position is premised on two arguments that we have already rejected.

First, I-CA argues that if it is entitled to joint and several liability against the two defendants, then it should be the prevailing party because, without prejudgment interest on Plasgad's claim, it recovered $450,275.25 against Plasgad's $327,396.96. We have determined that the trial court correctly declined to impose joint and several liability, therefore we decline to discuss this argument further.

I-CA next argues that if this court grants reversal of the nonsuit as to its punitive damages claim against Plasgad, there must be a redetermination of the prevailing party. We have determined that the trial court did not err in granting nonsuit on the punitive damages claim against Plasgad, therefore we also decline to discuss this argument.

## II. Cross-appeal

### A. *Interference with contractual relations*

Palram's main argument in its cross-appeal is that substantial evidence does not support the verdict against it on the tort of interference with contractual relations. Palram argues that the only act that I-CA alleged in this cause of action was that Palram supposedly induced a breach of contract by Plasgad. Palram points out that I-CA gave up its claim against Plasgad for breach of contract and never proved any such breach. Instead, the only evidence was that Plasgad terminated the contract with six months notice, as called for in the contract. In addition, Plasgad continued to fulfill its obligations under the contract during the six months after its notice of termination, despite I-CA's refusal to pay for Plasgad's products.

#### 1. Applicable law

"[A] stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 (*PG&E*).) The elements of the tort are: "(1) a valid contact between plaintiff and a third party; (2) defendant's knowledge of this contract; (3)

defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citations.]" (*Ibid.*)

The *PG&E* court addressed the question of "whether inducing a party to a contract to seek to terminate the contract according to its terms is ever actionable interference with contractual or prospective economic relations." (*PG&E, supra*, 50 Cal.3d at p. 1126.) The court concluded that "it may be actionable to induce a party to a contract to terminate the contract according to its terms." (*Id.* at p. 1127.) The court explained, "it is the contractual relationship, not any term of the contract, which is protected against outside interference." (*Ibid.*) Even an at-will contract is subject to a claim for interference. Just because the contract is "'"at the will of the parties, respectively does not make it one at the will of others."'" [Citations.]" (*Ibid.*) Thus, "'[t]he actionable wrong lies in the inducement to breach the contract or to sever the relationship, not in the kind of contract or relationship so disrupted, whether it is written or oral, enforceable or not enforceable.' [Citations.]" (*Ibid.*)

In addition, "a person is not justified in inducing a breach of contract simply because he is in competition with one of the parties to the contract and seeks to further his own economic advantage at the expense of the other. [Citation.]" (*Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 36.) This is because, "[w]hatever interest society has in encouraging free and open competition by means not in themselves unlawful, contractual stability is generally accepted as of greater importance than competitive freedom." (*Ibid.*) A party may not, "under the guise of competition actively and affirmatively induce the breach of a competitor's contract." (*Id.* at p. 37.)

### 2. Substantial evidence supports the jury's finding of liability

The evidence in the record supports the jury's finding of liability for intentional interference with contractual relations.

Palram does not dispute the existence of a contract between Plasgad and I-CA. And while Palram's president testified that he did not know that Plasgad had a contract with I-CA, there was other evidence in the record suggesting that Palram knew of I-CA's

35

contract with Plasgad. Even if the jury believed that Palram's president did not have knowledge of the written contract between I-CA and Plasgad, the jury was justified in finding that Palram's executives at least knew of the contractual relationship between I-CA and Plasgad. There was evidence that Palram knew that I-CA was the exclusive distributor of the plastic closure strips in North America.

Next, the jury was required to find intentional acts designed to induce a disruption of the contractual relationship between I-CA and Plasgad. There was evidence that Plasgad raised its prices in December 2005, and while Palram ultimately agreed to the price increase, it placed no further orders for the product between January and August of 2006.

When Aloni confronted Palram regarding his concern that there were no orders placed during the first half of 2006, Palram stated that it was looking for a secondary supplier for the strips. This statement was made in spite of Palram's alleged knowledge that Plasgad had a patent on the product and Palram could not purchase it from anyone else.

In late 2006, within a few days of each other, both Plasgad and Palram notified I-CA that each was terminating its contractual relationship with I-CA. Plasgad asserted that I-CA had not achieved the minimum level of sales required to retain the right to sell the products. However, there was evidence that no sales goals had ever been discussed between the parties. In addition, there was evidence that the sales of the plastic closure strips had been successful.

As early as February 2007, Plasgad and Palram were discussing working directly with each other regarding the sale of the plastic closure strips.

Taken together, the jury could reasonably have found that Palram intentionally interfered with I-CA's relationship with Plasgad. First, while Palram and Plasgad never had a relationship with each other prior to the events described above, the jury could infer that they subsequently formed such a relationship behind I-CA's back with the intent of keeping I-CA out of the relationship. The jury could also justifiably find that this plan was instigated by Palram, since as early as 2005 Plasgad notified I-CA that Palram was

36

attempting to contact Plasgad directly, against Plasgad's wishes and in violation of the understanding that Plasgad had with I-CA. The jury could certainly infer that Palram continued its efforts to get to Plasgad directly, in spite of both Plasgad's and I-CA's direct communications to Palram that it should not contact Plasgad directly, but should go through I-CA.

Furthermore, the jury could have concluded that both Palram and Plasgad fabricated their reasons for terminating their contractual relationships with I-CA. In particular, Plasgad referred to allegedly nonexistent sales goals. The jury was entitled to infer that this pretense masked Plasgad's real reason for terminating its relationship with I-CA: Palram had induced it to do so.

The jury is entitled "to make any logical and reasonable deduction" from the evidence before it. (*Juchert v. California Water Service Co.* (1940) 16 Cal.2d 500, 507-508.) Here, the jury was entitled to infer that Palram engaged in intentional acts designed to disrupt the relationship between I-CA and Plasgad -- and in fact, successfully carried out such a disruption. "[T]he jury is the exclusive judge of the weight and value of the inference that may be drawn by [the evidence]; . . . [t]he fact that some inference other than that which has been drawn by a jury may appear to an appellate tribunal to be the more reasonable, affords no sufficient reason for disturbing the inference in question. [Citation.]" (*Id.* at p. 508.)

Because there is sufficient evidence to support I-CA's claim against Palram for intentional interference with its contract with Plasgad, we decline to disturb the jury's finding of liability on this issue.

### 3. The cases cited by Palram do not mandate reversal in this case

Palram cites several cases suggesting that engaging in lawful competition does not amount to interference with contractual relations. However, as set forth below, the cases do not convince us that the jury verdict in this case must be reversed.

First, Palram relies upon *Augustine v. Trucco* (1954) 124 Cal.App.2d 229 (*Augustine*). In *Augustine*, the plaintiff was a real estate broker who had a written agreement with the sellers of real property which entitled him to a commission upon sale.

The agreement expired, but the plaintiff contended that it was orally extended. The plaintiff found a buyer, but the sellers refused an offer from the buyer at that time. Two years later, however, the sellers sold their property to the same buyer, who had been found by another real estate firm.

The trial court found a nonsuit as to the plaintiff's claims against the second real estate firm for inducing breach of contract. Significantly, the court found that after the written contract between the plaintiff and the sellers expired, the plaintiff had no contract with the sellers. (*Augustine, supra*, 124 Cal.App.2d at p. 246.) Although he continued to attempt to procure buyers for the property, "[h]e was acting as a mere volunteer." (*Id.* at p. 237.) Thus, at the time of the alleged interference, there was no contractual relationship between the plaintiff and the sellers in which the second real estate company could interfere. In the matter before us, the evidence showed that such a contractual relationship existed between I-CA and Plasgad at the time of Palram's interference.

In addition, there was no allegation in the complaint that the second real estate firm "intentionally or actively induced or persuaded [the sellers] to breach any contract with plaintiff." (*Augustine, supra*, 124 Cal.App.2d at p. 246.) In contrast, here, there is evidence that Palram did induce Plasgad to end its contractual relationship with I-CA. Thus, the *Augustine* case is not persuasive.

Next, Palram cites *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579 (*PMC*), overruled on other grounds in *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159. The case concerned a manufacturer's action against an entertainment company. The manufacturer was bidding to obtain exclusive rights to market and manufacture items using the name of a children's television series, but the entertainment company ultimately entered into a contract with the manufacturer's competitor. The manufacturer brought causes of action for breach of contract against the entertainment company and interference with contractual and prospective economic advantage against the competitor.

In rejecting the manufacturer's cause of action for interference with prospective economic advantage, the *PMC* court made reference to the "competition privilege."

(*PMC, supra*, 45 Cal.App.4th at p. 602.)  Under that privilege, "'a competitor is free to divert business to himself as long as he uses fair and reasonable means.'  [Citation.]"  (*Id.* at p. 603.)  In that case, there was no evidence that the competitor had engaged in any wrongful or illegitimate conduct, but was "simply engaging in hard-nosed and ultimately successful bargaining for the exclusive license also sought by [the plaintiff manufacturer]."  (*Id.* at p. 606.)  Significantly, the *PMC* court did not apply the competition privilege in its discussion of the tort of interference with contractual relations -- instead, it found that "no *enforceable* contract existed."  (*Ibid.*)  Under the circumstances, we are not convinced that the competition privilege is properly applied under the facts before us.

Finally, Palram cites *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867 (*Bed, Bath & Beyond*).  The case involves a factual situation very similar to that found in *PMC*.  The plaintiff negotiated a lease of retail space, the terms of which were reduced to a written agreement which was signed by the plaintiff but not the shopping center.  Soon thereafter, the space was leased to a competitor of the plaintiff.  The plaintiff filed an action for breach of contract against the shopping center and interference with contractual relations and prospective economic advantage against the competitor.  As in *PMC*, the action for interference with contractual relations was summarily adjudicated in the defendant's favor on the ground that no enforceable contract existed.  The cause of action for interference with prospective economic advantage was defeated by the fair competition privilege.  Instead, the defendant merely competed successfully for a lease of the premises by offering a better deal.

For the same reasons discussed as to *PMC*, the *Bed, Bath & Beyond* case does not convince us that reversal is required in this matter.

## DISPOSITION

The judgment is affirmed.  Each side to bear their own costs of appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| I-CA ENTERPRISES, INC., | No. B243362 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. LC077949) |
| v. | ORDER FOR PUBLICATION |
| PALRAM AMERICAS, INC., | |
| Defendant and Appellant; | |
| PLASGAD PLASTIC PRODUCTS AGRICULTURAL COOPERATIVE LTD. OF KIBBUTZ GADOT, | |
| Defendant and Respondent. | |

THE COURT:*

The opinion in the above entitled matter filed on February 18, 2015, was not certified for publication.

For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

*BOREN, P. J., CHAVEZ, J.

1